## STONE & WEBSTER ENGINEERING CORP.

### v.

## AMERICAN MOTORIST INSURANCE CO. et al.

### Civ. A. No. 77–0119–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 18, 1978.

Charles W. Laughlin, James W. Tredway, III, William F. Etherington, Richmond, Va., for plaintiff.

Philip B. Morris, Richmond, Va., for American Motorist Ins. Co.

Frank B. Miller, III, Edward A. Marks, Jr., Richmond, Va., for Continental Casualty Co.

John P. Arness, David J. Hensler, Washington, D. C., Gail Starling Marshall, Alexandria, Va., for The Home Ins. Co.

MEMORANDUM

WARRINER, District Judge.

This is the latest in a very long and complicated series of transactions, both commercial and legal, involving the construction of a nuclear power station for the Virginia Electric and Power Company (VEPCO) on the North Anna River near Mineral, in Louisa County, Virginia. Defendants American Motorist Insurance Co. (AMI) and Continental Casualty Company have moved the Court for partial summary judgment on the issue of whether their respective policies of insurance afford coverage for plaintiff Stone & Webster for the claims asserted against Stone & Webster in the case *Virginia Electric and Power Co. v. Sun Ship Building & Dry Dock Co. v. Stone & Webster Eng. Co.*, CA No. 74–0483 (E.D.Va. settled 9 December 1976). The policies are intended to cover an insured for liability respecting "property damage" as defined in the policies. Because the provisions of the policies involved are substantially the same, the Court will consider these two motions together.

According to Fed.R.Civ.P. 56, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As recently as 29 September 1978, the Court of Appeals reminded us, "it is settled law in this Circuit that summary judgments are to be granted only where it is perfectly clear that there is no genuine issue either of evidentiary fact or of inferences to be drawn therefrom." *Roth Brothers Co., Inc., v. Insurance Co. of North America*, No. 77–1865 (4th Cir., Sept. 29, 1978), slip op. at 11. With this standard in mind, the Court will consider the undisputed facts in this case.

Stone & Webster and VEPCO entered into an "agency contract" whereby Stone & Webster would act as VEPCO's agent to build a nuclear power station. As part of that project, Stone & Webster ordered some structural supports from Sun Ship Building and Dry Dock Co. (Sun Ship). Sun Ship fabricated the Stone & Webster designed supports and Stone & Webster supervised their fabrication and inspected them during construction and after completion. Three of the several supports had been installed in the course of building the power plant when it was discovered that the supports were defective. VEPCO repaired in place those supports that were already installed and sent those that were not installed to another firm for repair. VEPCO then sued Sun Ship and Sun Ship impleaded Stone & Webster. A settlement was reached under which Stone & Webster paid VEPCO a large sum of money. Stone & Webster, alleging property damage, now seeks to be reimbursed by the defendant insurance carriers.

In this attempt Stone & Webster may be likened to Odysseus, the great navigator of antiquity. Returning from defeated Troy to his beloved Ithaca and the waiting arms of his tender wife Penelope, the wily Odysseus successfully avoided many terrible hazards. By his valor and guile he eluded the Sirens, defeated the Cyclops, withstood the Harpies, survived the dual perils of Scylla and Charybdis, and at last—after ten years of arduous voyaging, won his weary way home.

Similarly, Stone & Webster has had thrown up before it a formidable series of obstacles in attempting to fix liability for its payments upon the defendant insurance carriers. Alas! Unlike Homer of old, the Court is unable to treat the gentle reader to a tale of obstacles surmounted and foes overcome. For Stone & Webster's ship founders upon the very first rock located at the mouth of Troy's shipping lanes—there simply has been no property damage as defined in the defendants' insurance policies.

I

Defendants promised to pay Stone & Webster all sums which Stone & Webster became legally liable to pay as the result of property damage. Property damage is

defined in each policy as "injury to or destruction of tangible property." Defendants both contend that the mere installation of defective parts which do no physical damage to other components of a building does not result in property damage under their policies. Stone & Webster responds that many cases have held that incorporation of a defective product into a structure is property damage within the meaning of the term as defined in the policies in question here.

AMI asserts that the Court must look to the law of Massachusetts, the State in which the policy was delivered for aid in construing the terms of its policy. Stone & Webster does not dispute this assertion, but neither party has found any law or decision of Massachusetts which applies to this case. Nor has the Court's attention been drawn to any law or decision of Virginia, the State in which the Continental policy was delivered, dealing with the question of property damage within the context of this case.

The parties instead rely on conflicting rulings from both State and federal courts in many jurisdictions to buttress their arguments. The defendants rely primarily on *Hamilton Die Cast v. United States Fidelity & Guarantee Co.*, 508 F.2d 417 (7th Cir. 1975). In that case the court construed an insurance policy which defined property damage as "injury to or destruction of tangible property." This definition is not the same as the definition contained in the AMI policy, which contains in addition the words "including the loss of use resulting from such property damage." However, the Court does not agree with Stone & Webster that this added language makes a difference. Only such loss of use as results from injury to or destruction of tangible property is included in the AMI policy definition. Where there is no injury to or destruction of tangible property, there is no property damage under either policy.

In *Hamilton Die Cast*, plaintiff furnished defective aluminum tennis racket frames which the buyer used to make tennis rackets. The buyer sued plaintiff which in turn sued its insurance carrier. The insurance

company argued that no property damage had occurred, and the plaintiff contended that there was property damage to the finished racket because the defective part was incorporated into it. The court found this proposition "far-fetched," and reasoned that where a defective tire is installed on a car and causes a wreck, there is property damage, but if the defect is found and repaired before any wreck, there is no property damage.

This rule was reiterated by the Seventh Circuit in *Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681 (7th Cir. 1977). Dreis & Krump built a press brake that was sold to Bustin Steel Products. Bustin sued Dreis & Krump for damages claiming that the press brake was defective. Dreis & Krump turned to its insurance carrier, which refused to defend on grounds that there was no coverage. The definition of property damage in *Dreis & Krump* is the same as that in the AMI policy.

*Dreis & Krump* argued that the reduction in the market value of the special structure built by Bustin to house the defective press brake was property damage under the policy. Bustin did not allege such "property damage" in its complaint, however. The Seventh Circuit dismissed the authorities relied on by *Dreis & Krump* as stating the law of other jurisdictions and adhered to its holding in *Hamilton Die Cast* that the mere incorporation of defective components into a structure does not, in and of itself, constitute property damage.

Stone & Webster relies primarily on two Third Circuit cases, *Pittsburg Plate Glass Co. v. Fidelity & Cas. Co.*, 281 F.2d 538 (3d Cir. 1960) and *Bowman Steel Corp. v. Lumberman's Mutual Cas. Co.*, 364 F.2d 246 (3d Cir. 1966). In *Pittsburg Plate Glass*, the plaintiff sold paint to a company that made jalousies but the paint began to peel off and the jalousies had to be repaired and repainted. Pittsburg called on its insurer to defend it in a suit brought by the manufacturer, but the insurer said that the peeling of the paint was not a physical injury to the jalousies as comprehended by the policy. The policy covered "damages because of

physical injury or physical destruction of tangible property."

The Third Circuit held that once the paint had been applied to the jalousies it was no longer identifiable as a separate entity but was a part of the finished product. Thus, when the paint peeled the entire product was damaged in a manner covered by the policy. The Court also noted that under the allegations of the complaint proof of damages to the metal parts of the jalousies by rust would have been permitted.

In *Bowman Steel*, the plaintiff manufactured a special type of metal siding for buildings which proved defective. Plaintiff removed and replaced the defective siding and sought reimbursement from its liability insurer. The district court held that because there was no damage to the building to which the siding was attached there was no "injury to or destruction of property" within the policy. The Third Circuit reversed, holding that when defective siding was attached to the buildings they suffered diminution in market value and suffered property damage to that extent. In this holding the Third Circuit followed the rule of *Hauenstein v. St. Paul Mercury Indem. Co.*, 242 Minn. 354, 65 N.W.2d 122 (1954). *Hauenstein* involved defective plaster which was applied to the interior walls and ceilings of a building.

Stone & Webster also relies upon *Arcos Corp. v. American Mut. Liab. Ins. Co.*, 350 F.Supp. 380 (E.D.Pa.1972), *aff'd mem.* 485 F.2d 678 (3d Cir. 1973). Arcos supplied weld wire to General Dynamics for use in a nuclear submarine. Some of the weld wire supplied by Arcos was of the wrong type, and could not withstand stress. The Court held, citing *Bowman Steel* and *Pittsburg Plate Glass*, that when this weld wire was used in building the submarine, property damage occurred.

In *United States Fidelity and Guar. Co. v. Nevada Cement Co.*, 561 P.2d 1335 (Nev. 1977) a cement manufacturer supplied defective cement to a concrete supplier which in turn sold the concrete to a contractor. The defective concrete weakened the structural integrity of the building in which it was used and so caused injury to or destruction of tangible property according to the Nevada Supreme Court. Stone & Webster contends that a similar weakening of the structural integrity of the North Anna nuclear power station occurred when the defective supports were installed at the North Anna site.

Two Illinois cases which consider both lines of authority have been cited to the court. In *Elco Industries, Inc. v. Liberty Mut. Ins. Co.*, 46 Ill.App.3d 936, 5 Ill.Dec. 266, 361 N.E.2d 589 (1977) the trial court granted summary judgment for the insured on stipulated facts. The insured had been sued by a manufacturer of engines for failure to properly heat treat and caseharden some governor regulating pins sold to the engine manufacturer. The Illinois appeals court noted both the *Hamilton Die Cast* case and the *Arcos* case, and reversed the grant of summary judgment on grounds that it was unclear on the basis of the record whether the installation of the governor regulating pins was such that the pins became so intertwined with the mechanism that the defect and their subsequent removal necessarily resulted in damage to the completed product. The Court noted:

It has not been shown in the present case that removal of the pins required expenditures greater than that necessary to replace the pins themselves and that the defective pins resulted in damage to the other parts of the engine. 361 N.E.2d at 591–2.

In *Pittway Corp. v. American Motorists Ins. Co.*, 56 Ill.App.3d 338, 13 Ill.Dec. 244, 370 N.E.2d 1271 (Ill.App.1977) the court considered a case in which a manufacturer of aerosol valves sought to recover from its liability insurance carrier for damages suffered when its defective valves were incorporated in cans of hair spray which rendered the hair spray cans useless. The insurance company relied upon *Hamilton Die Cast* and *Dreis & Krump* for the proposition that the inclusion of a defective component in a product does not per se result in property damage. The Illinois court, however, recognized as the majority rule that the

term " 'property damage' includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property." 370 N.E.2d at 1274. The court distinguished both *Hamilton Die Cast* and *Dreis & Krump* on grounds that the complaint against the insureds did not in either of those cases allege injury to or diminution in value of any tangible property.

■ This Court first notes that neither the third party complaint against Stone & Webster nor the original complaint against Sun Ship in the underlying litigation alleged either actual physical injury to tangible property or the diminution in value of any tangible property. Stone & Webster argues in its brief, however, that the North Anna nuclear power station was diminished in value by the inclusion therein of three faulty supports.[1] Because the Court believes that it is perfectly clear that such is not the case, the Court will enter summary judgment in favor of defendants AMI and Continental.

At the time the supports were installed at the North Anna site there was no nuclear power station in existence to be damaged or diminished in value. To take the example of the *Hamilton Die Cast* court one step further, where a defective tire is installed on an automobile which is in the process of being built and the defect is discovered while the car is still incomplete, and the defect is remedied, there is no property damage to the proposed automobile as that term is defined in the insurance policies in question here. Here, VEPCO had no power station to be damaged. There was the idea of a power station, the plan for constructing a power station, and work in progress to that end in existence at North Anna. The coverage of the two policies in question here is limited to injury to *tangible* property only. The damaged property pointed to by Stone & Webster was the proposed power station. It wasn't in existence. No such injury could have occurred.[2]

Furthermore, in order for the Court to find property damage under the diminution in value theory the market value of VEPCO's property after the installation of the supports must have been less than the market value of the property before the installation of the supports. The only evidence of the market value of the site at North Anna before and after the installation of the defective supports is derived from the behavior of the owner, VEPCO. If the market value of the site without the defective supports was greater than the market value with the defective supports installed, then the only logical course of action for VEPCO to follow would have been to remove the supports fabricated by Sun Ship and replace them with other supports. This, however, is not what VEPCO did. It is undisputed that VEPCO arranged to have those supports which had been installed on the site at North Anna repaired *in situ*. The only conclusion which may be drawn from VEPCO's behavior is that the

1. Stone & Webster's theory (and that of its supporting authorities) of property damage, that is, that where an occurrence results in a diminution in market value of tangible property, there one has property damage, falls of its own weight.

Assume real property, say a dwelling house, belonging to a governor of a State. Real estate agents will readily and properly testify that such property is increased in market value because its seller would be a governor. Assume the governor is impeached. This occurrence (or its basis) would result in a diminution of the fair market value of the dwelling. Aside from the question of liability, Stone & Webster would have to argue that the impeachment resulted in property damage, as it defines that term in its brief. Indeed, under Stone & Web-

ster's argument, *any* occurrence, be it a raise in interest rates, a war, or a strike in a dominant industry, which diminishes property values, meets the definition sought to be imposed by Stone & Webster. Such coverage could not have been contemplated by the parties.

2. It is true that no matter what the state of construction, real estate, as improved, has more or less market value. It is also true that as a result of property damage its attained market value at any stage of construction may be diminished. But VEPCO did not assert any such claim and, more significantly, neither does Stone & Webster. Stone & Webster seeks reimbursement for payments made by it on account of property damage "to the North Anna power plant." Plaintiff's brief filed 1 May 1978, p. 2.

property at North Anna was in fact more valuable after the installation of the supports, albeit defective, than was the property before the installation of the supports.[3] There is nothing in the proofs before the Court to support a view that VEPCO behaved illogically or uneconomically. Therefore no inference may properly be drawn in conflict with this alternative basis for the Court's holding.

In sum, the Court concludes that the diminution in market value theory of property damage may not properly be applied to incomplete, nonexistent, and unmarketable structures. Further, the Court concludes that the uncontradicted evidence shows that the value of VEPCO's property was enhanced by the installation of the defective supports. Accordingly, the Court holds that the damage suffered by VEPCO for which it sued Sun Ship was not "property damage" within the meaning of the policies of insurance issued by AMI and Continental.

## II

Stone & Webster argues that both Continental and AMI have waived their reliance upon the absence of property damage or are estopped from asserting the absence of property damage in this case by their actions. The general rule in insurance law and the rule established in Virginia is that an insurer waives or is estopped from asserting a ground of noncoverage under an insurance policy only by assuming and conducting the defense of an action brought against the insured without disclaiming liability and without giving notice of its reservation of rights. *Insurance Co. of North America v. Atlantic National Ins. Co.*, 329 F.2d 769, 775–6 (4th Cir. 1964).

The facts upon which Stone & Webster bases its claim of estoppel or waiver are as follows: Stone & Webster tendered the defense of the underlying action in this case to AMI. AMI reached the conclusion that it might be liable for some of the damages alleged by VEPCO and Sun Ship in their complaints, and so agreed with Stone & Webster to share with it the costs of defense. Stone & Webster would pay 25% of the cost and AMI would pay the remaining 75%. Stone & Webster and AMI further agreed that the attorneys who had theretofore conducted the defense of the action for Stone & Webster would continue to represent Stone & Webster, but would submit their invoices to AMI. Later, AMI learned of the existence of the Continental Insurance Policy, and called upon Continental to share in the cost of defense as well. Continental replied that it would do so, reserving its rights under its policy against Stone & Webster, with the proviso that it would share only those costs of defense incurred after it received notice of the action. Subsequently, AMI denied coverage under the policy and stopped contributing to the defense of the action. Continental never contributed any sums of money to the defense of the action.

Thus, the undisputed facts show that neither AMI nor Continental assumed and conducted the defense of the underlying action for Stone & Webster. At most, AMI contributed to the legal fees of Stone & Webster's retained counsel. Continental did not even do this much, and did that which it did under a clear reservation of rights. Accordingly, the Court finds no waiver or estoppel on the part of the insurance companies.

AMI and Continental have advanced several other grounds for their motions for summary judgment. To the extent that these can be decided on summary judgment the Court has determined that the law favors Stone & Webster. Accordingly, these other grounds are not discussed in this memorandum.

An appropriate order will issue.

---

**3.** Such fact does not, of course, mean that VEPCO had no damages. Its damages simply were not limited by definitions in insurance policies, nor were they asserted or measured in terms of diminution in market value.