CALVIN C. WEEDO AND JANICE WEEDO, HIS WIFE, PLAIN-
TIFFS, v. STONE–E–BRICK, INC. AND RALPH ROMANO, IN-
DIVIDUALLY, DEFENDANTS AND THIRD PARTY PLAIN-
TIFFS-RESPONDENTS, v. PENNSYLVANIA NATIONAL MU-
TUAL CASUALTY INSURANCE COMPANY, THIRD PARTY
DEFENDANT-APPELLANT.

GUS GELLAS AND THELMA A. GELLAS, HIS WIFE, PLAINTIFFS,
v. ALFRED VIVINO, DEFENDANT, AND JAMES FREY AND
RALPH ROMANO, THIRD PARTY DEFENDANTS AND
FOURTH PARTY PLAINTIFFS-RESPONDENTS, v. PENNSYL-
VANIA NATIONAL MUTUAL CASUALTY INSURANCE COM-
PANY, FOURTH PARTY DEFENDANT-APPELLANT.

Argued December 11, 1978—Decided July 18, 1979.

Mr. Thomas P. McHugh argued the cause for appellants (*Messrs. Gurry and Conlan,* attorneys; *Mr. McHugh,* on the brief).

Mr. George W. Parsons, Jr., argued the cause for respondents (*Messrs. Cole, Geaney & Yamner,* attorneys; *Mr. H. George Avery,* on the brief).

Messrs. Morgan, Melhuish, Monaghan & Spielvogel, filed a brief on behalf of *amicus curiae* Insurance Company of North America (*Mr. Henry G. Morgan,* on the brief).

Messrs. Budd, Larner, Kent, Gross, Picillo & Rosenbaum, filed a brief on behalf of *amicus curiae* The Travelers Insurance

Company (*Mr. Mark D. Larner*, of counsel; *Ms. Harriet F. Klein*, on the brief).

The opinion of the court was delivered by

CLIFFORD, J.

We granted certification, 75 *N.J.* 615 (1978), to review the Appellate Division's determination that the appellant insurance carrier was obliged to defend two claims brought against its assureds. *Weedo v. Stone-E-Brick, Inc.*, 155 *N.J.Super.* 474 (1977). Resolution of both cases, argued here together, calls for construction of the same comprehensive general liability provisions of a policy issued to a masonry contracting concern. Specifically, the question is whether that policy indemnifies the insured against damages in an action for breach of contract and faulty workmanship on a project, where the damages claimed are the cost of correcting the work itself. The Appellate Division held that certain exclusions of the policy, when read together, were ambiguous and hence had to be resolved against the insurer. We reverse.

I

Pennsylvania National Mutual Insurance Company (hereinafter Pennsylvania National) issued a general automobile liability policy to Stone-E-Brick, Inc., a corporation engaged in masonry contracting. As part of the policy there was included Comprehensive General Liability Coverage (hereinafter CGL). During the term of the policy Calvin and Janice Weedo contracted with Stone-E-Brick to pour a concrete flooring on a veranda and to apply stucco masonry to the exterior of their home. The completed job revealed cracks in the stucco and other signs of faulty workmanship, such that the Weedos had to remove the stucco and replace it with a proper material. Thereupon the Weedos instituted suit against Stone-E-Brick and its principal, defendant Romano, alleging in pertinent part that

[a]s a result of the defective and unworkmanlike manner in which the defendants applied the said stucco, plaintiffs were compelled to and did cause the defects existing therein to be remedied, where possible, and the omissions to be supplied, and, in general, *were compelled to and did furnish all the work, labor, services and materials necessary to complete the application of the said stucco in accordance with the contract and were compelled to and did expend large sums of money for that purpose in excess of the price which plaintiffs agreed to pay defendants for the application of said stucco, all of which was to plaintiffs' damage.* [Emphasis supplied.]

While the same CGL policy was in effect, Stone-E-Brick performed roofing and gutter work on a house being constructed for plaintiffs Gellas, under a sub-contract agreement with the general contractor, defendant Vivino. After completion of the home the Gellases brought suit against Vivino based on breach of contract due to defects in workmanship and seeking recovery of costs "in connection with the repair and/or replacement of material necessary to correct the  *  *  *  defects in construction." Vivino in turn sought indemnification from Stone-E-Brick by way of third-party complaint, contending that plaintiffs' damages were the result of Stone-E-Brick's "faulty workmanship, materials or construction  *  *  * ."

Thereafter Stone-E-Brick requested that Pennsylvania National take over the defense and indemnify it in regard to both complaints. The carrier refused, asserting that the policy of insurance did not furnish coverage for the claims made or, in the alternative, that exclusionary clauses specifically precluded coverage. By way of third-party complaint in the Weedo case and fourth-party complaint in the Gellas suit, Stone-E-Brick demanded judgment against Pennsylvania National for all sums found due as against the insured and in favor of the respective plaintiffs. Cross-motions for summary judgment in each case produced contrary results, namely, an order dismissing Stone-E-Brick's third party complaint against the carrier in the Weedo case and an order in favor of the insured compelling coverage in the Gellas suit. On appeal the Appellate Division, as already noted, found coverage in both instances.

## II

Under the CGL provisions of the policy in question Pennsylvania National agreed to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * bodily injury * * * or *property damage to which this insurance applies,* caused by an occurrence * * * ." (Emphasis supplied). This is the standard language found in the great majority of CGLs written in this country. These provisions, developed by casualty rating bureaus over a period of nearly fifty years, have become an established norm of underwriting policy. Tinker, "Comprehensive General Liability Insurance—Perspective and Overview" 25 *Feder.Ins.Coun.Q.* 217, 218–21 (1975); Henderson, "Insurance Protection for Products Liability and Completed Operations— What Every Lawyer Should Know," 50 *Neb.L.Rev.* 415, 418 (1971).[1]

These agreements set forth, in fundamental terms, the general outlines of coverage, *e. g.,* "for property damage to which this insurance applies." The qualifying phrase, "to which this insurance applies" underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy. The limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded.[2] *Capece v. Allstate Ins.*

---

[1]The standard provisions of the CGL have undergone four principal revisions—in 1943, 1955, 1966 and 1973—since their initial promulgation in 1940. Tinker, *op. cit., supra,* 25 *Feder.Ins.Coun.Q.* at 221. The terms pertinent to the present case have not been altered in a manner relevant to the issues before the Court since the 1966 revision.

[2]Pennsylvania National conceded at oral argument before us, as apparently it did before the Appellate Division, see 155 *N.J.Super.* at 479, that but for the

*Co.,* 88 *N.J.Super.* 535, 541 (Law Div.1965); Tinker, *op. cit., supra,* 25 *Feder.Ins.Coun.Q.* at 264. For example, a tavern-owner's liability coverage under the CGL is limited by force of the "dram shop" exclusion, where personal injury or property damage results from service of intoxicants to an incapacitated patron. See generally *Mt. Hope Inn v. Travelers Indemnity Company,* 157 *N.J.Super.* 431, 436–38 (Law Div.1978).

We set forth these basic principles simply to emphasize that, semantical rules of construction aside, contracts of insurance do contain relevant language (frequently developed, as here, see *n.* 1, *supra,* over the years after experience with different terms of expression) which serves to define the risks underwritten. In the present instance Pennsylvania National's policy undertook to furnish certain coverage to Stone-E-Brick as a concern engaged in masonry contracting. In order to determine whether the claims of plaintiffs fall within the coverage provided, we start with an examination of the insured's business relationships with its customers.

In the usual course of its business Stone-E-Brick negotiates with homeowners to provide masonry work. As part of the bargaining process the insured may extend an express warranty that its stone, concrete and stucco products and services will be provided in a reasonably workmanlike fashion. See, *e. g., Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 370 (1960). Regardless of the existence of express warranties, the insured's provision of stucco and stone "generally carries with it an implied warranty of merchantability and often an implied warranty of fitness for a particular purpose." *McDonald v. Mianecki,* 79 *N.J.* 275, 284 (1979); see also *Hodgson v. Chin,* 168

---

exclusions in the policy, coverage would obtain. Hence we need not address the validity of one of the carrier's initially-offered grounds of non-coverage, namely, that the policy did not extend coverage for the claims made even absent the exclusions.

*N.J.Super.* 549 (App.Div.1979). These warranties arise by operation of law and recognize that, under common circumstances, the insured-contractor holds himself out as having the capacity to apply the stonework in a workmanlike manner, and further, that the homeowner relies upon the representation and anticipates suitable goods and services. *McDonald v. Mianecki, supra,* 79 *N.J.* at 289–90.

Where the work performed by the insured-contractor is faulty, either express or implied warranties, or both, are breached. As a matter of contract law the customer did not obtain that for which he bargained. The dissatisfied customer can, upon repair or replacement of the faulty work, recover the cost thereof from the insured-contractor as the standard measure of damages for breach of warranties. *Id.* at 282 *n.* 1; *525 Main Street Corp. v. Eagle Roofing Co. Inc.,* 34 *N.J.* 251, 255 (1961).

As explained in *McDonald v. Mianecki, supra,* a principal justification for imposing warranties by operation of law on contractors is that these parties are often "in a better position to prevent the occurrence of major problems" in the course of constructing a home than is the homeowner. 79 *N.J.* at 288–89. The insured-contractor can take pains to control the quality of the goods and services supplied. At the same time he undertakes the risk that he may fail in this endeavor and thereby incur contractual liability whether express or implied. The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers. See Tinker, *op. cit., supra,* 25 *Feder.Ins.Coun.Q.* at 224; Henderson, *op. cit., supra,* 50 *Neb.L. Rev.* at 441.

There exists another form of risk in the insured-contractor's line of work, that is, injury to people and damage to property caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental

injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting.

In this regard Dean Henderson has remarked:

The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained. [Henderson, *op. cit.*, *supra*, 50 *Neb.L.Rev.* at 441.]

An illustration of this fundamental point may serve to mark the boundaries between "business risks" and occurrences giving rise to insurable liability. When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable—the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory

or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risks intended to be covered under the CGL.

The standardized provisions in the CGL intended to convey this concept include, *inter alia*, the very exclusion clauses at issue herein. Tinker, *op. cit., supra,* 25 *Feder.Ins.Coun.Q.* at 244–25. These exclusions—"insured products" (exclusion "(n)") and "work performed" (exclusion "(o)")—are as follows:

\* \* \* This insurance does not apply

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

We agree with Pennsylvania National that, given the precise and limited form of damages which form the basis of the claims against the insured, either exclusion is, or both are, applicable to exclude coverage. In short, the indemnity sought is not for "property damage to which this insurance applies." Tinker, *op. cit., supra,* 25 *Feder.Ins.Coun.Q.* at 233; see also, *Adams Tree Service Inc. v. Hawaiian Insurance & Guaranty Co. Ltd.,* 117 *Ariz.* 385, 573 *P.2d* 76, 80 (Ct.App.1977).

Our view is consistent with the treatment of the "insured's products" and "work performed" exclusions in the great majority of courts elsewhere. Because of the factual similarity and the uniform wording of the exclusionary clauses, the reasoning in these decisions is thoroughly persuasive.[3] *Biebel Bros., Inc. v.*

---

[3]The "insured's products" and the "work performed" exclusions, denominated "(n)" and "(o)" in the present standard CGL, appeared as exclusions "(l)" and "(m)" in policies written before the last decade. The literal wording of the exclusions, however denominated, has remained constant for some fifteen years.

*United States Fidelity & Guar. Co.*, 522 *F.*2d 1207 (8th Cir. 1975), is illustrative. In *Biebel,* a roofing contractor instituted an action against its liability insurer to recover the costs of removing defective roofing and the additional expense of supplying adequate roofing thereafter—work which was called for by the contract with the dissatisfied customer. Not unlike the instant case, the insured's faulty work was not alleged to have caused any property damage to property other than the work product of or materials supplied by the insured. *Id.,* at 1209.

The trial court granted summary judgment in favor of the insured. On appeal the insurer contended that the clear meaning of the exclusion clauses contained in its CGL policy was that the subject insurance did not apply to damage to the insured's work. Exclusion "(m)", identical to exclusion "(o)" in the instant case, was deemed controlling by the Circuit Court of Appeals. In reversing, the court observed:

> The language of the exclusion is broad, unambiguous and all-inclusive. It clearly provides that the insurance does not apply to property damage to work performed by or on behalf of appellee arising out of either the work or any portion thereof, or out of material, parts or equipment furnished in connection therewith. Beyond question, the application of the initial and subsequent coats of asphalt, the placement of the fiberglass insulation and the asphalt-coated base sheets, and the placement of the two layers of saturated roofing felts asphalt [sic: felts and asphalt] was work performed by or on behalf of appellee arising out of its contract. Furthermore, all the materials—not just the asphalt alone—were furnished by appellee in connection with the work project. The entire defective product, consisting of appellee's work and material, was directly removed by it. If exclusion (m) does not apply to the facts before us, it is completely meaningless. [522 *F.*2d at 1211.]

The court also concluded that the "insured's product" exclusion (a literal analogue to exclusion "(n)" in the instant matter) applied inasmuch as the damages claimed arose out of the faulty asphalt supplied by the insured. *Id.* at 1211. Numerous cases construe the pertinent exclusions in similar fashion to exclude coverage in factual circumstances related to those in this case.

*Ross Island Sand & Gravel Co. v. General Insurance Co. of America*, 315 *F.Supp.* 402 (D.Or.1970), affd., 472 *F.*2d 750 (9th Cir. 1973); *B. A. Green Constr. Co. v. Liberty Mutual Insurance Co.*, 213 *Kan.* 393, 517 *P.*2d 563, 656–67 (1973); *Adams Tree Service, Inc. v. Hawaiian Insurance & Guar. Co., Ltd., supra,* 573 *P.*2d at 79–80; *Engine Service, Inc. v. Reliable Insurance Co.*, 487 *P.*2d 474, 475–76 (Wyo.1977); *Timberline Equipment Co., Inc. v. St. Paul Fire and Marine Insurance Co.*, 281 *Or.* 639, 576 *P.*2d 1244, 1247–48 (1978); *Overson v. United States Fidelity & Guar. Co.*, 587 *P.*2d 149, 150–51 (Utah 1978).[4]

In addition to these decisions, which treat the very same "business risk" clauses as the exclusions in issue in this case, there exists another body of case-law pertaining to the "business risk" exclusion as it read prior to the development of the present

---

[4]This case does not involve any claim that the "insured's products" or "work performed" by the insured, because improper when applied to other property, resulted in "property damage" in the form of loss of use of the other property during repair or diminution in value of that other property, especially realty. See *Hauenstein v. St. Paul-Mercury Indem. Co.*, 242 *Minn.* 354, 65 *N.W.*2d 122, 125 (1954) (unworkmanlike application of plaster on a building resulting in "property damage" not excluded because it was claimed that presence of faulty stucco reduced value of building containing faulty bricks); *Stone & Webster Engineering Corp. v. American Motorist Insurance Co.*, 458 *F.Supp.* 792, 794–95 (E.D.Va.1978) ("property damage" exists, notwithstanding the exclusions, on the basis of an insured's supplying a faulty component which, when incorporated into a product, causes damage to the whole); *Yakima Cement Products Co. v. Great American Insurance Co.*, 22 *Wash. App.* 536, 590 *P.*2d 371, 376 (Ct.App.1979) (insured's supply of defective panels resulting in "property damage" not excluded because building wherein faulty paneling was placed suffered reduction in value). To the extent that these decisions are at odds with the underlying rationale of our determination today, we specifically disapprove them. Coverage which is not otherwise provided under a CGL cannot be created simply by a change in the form of words by which the damage claim is expressed.

standardized wording.[5]   The reasoning behind these decisions giving full effect to the "business risk" exclusion further underscores the result we have reached in this case.  See, *e. g., Volf v. Ocean Accident & Guar. Corp.*, 50 *Cal.*2d 373, 325 *P.*2d 987, 989 (1958); *Liberty Building Co. v. Royal Indemnity Co.*, 177 *Cal. App.*2d 583, 2 *Cal.Rptr.* 329, 331–32 (Ct.App.1960); *Kendall Plumbing, Inc. v. St. Paul Mercury Insurance Co.*, 189 *Kan.* 528, 370 *P.*2d 396, 398 (1962); *Vobill Homes, Inc. v. Hartford Accident & Indem. Co.*, 179 *So.*2d 496, 497–98 (La.App.), writ refused, 248 *La.* 698, 181 *So.*2d 398 (1965); *St. Paul Fire & Marine Insurance Co. v. Northern Grain Co.*, 365 *F.*2d 361, 368 (8th Cir. 1966); *Home Indemnity Co. v. Miller*, 399 *F.*2d 78, 81–83 (8th Cir. 1968).[6]

---

[5]The "business risk" exclusion contained in policies prepared before 1966 was worded as follows:

This policy does not apply:

\* \* \* \* \* \* \* \*

(h) under Coverage D, to injury or destruction of:

\* \* \* \* \* \* \* \*

(4) any goods, products, or containers thereof manufactured, sold, handled or distributed by the Insured, or work completed by or for the Insured, out of which the accident arises, nor to costs of repair or replacement thereof.  [Exclusion "h(4)", quoted in *S. L. Rowland Const. Co. v. St. Paul Fire & Marine Insurance Co.*, 72 *Wash.*2d 682, 434 *P.*2d 725, 728 (Wash.1967).]

[6]"Business risk" clauses have been given the same exclusionary effect in other contexts of insurance as that contained in the cited cases treating the exclusions in CGLs.  For example, "business risk" exclusions are contained in the standard contractual liability policy of insurance, where an insured obtains coverage for liability assumed under written contract limited by, among other things, the terms of the familiar "insured's products" and "work performed" exclusions.  The application of these exclusions in cases involving the coverage provided under the contractual liability policy is, once again, virtually unanimous where the damages claimed relate only to the insured's products or work.  See, *e. g., Southwest Forest Ind., Inc. v. Pole Buildings, Inc.*, 478 *F.*2d 185, 187–88 (9th Cir. 1973); *Eulich v. Home Indem. Co.*, 503 *S.W.*2d 846, 849 (Tex.Civ.App.1973); *Carboline Company v. Home Indem.*

### III

Our review of twenty years' worth of judicial treatment of the "business risk" exclusion demonstrates that, if nothing else, the underwriting policy sought to be articulated by clauses "n" and "o" has been widely recognized as a valid limitation upon standard, readily-available liability insurance coverage. Indeed, several courts have remarked in ruling upon the impact of these clauses that the terms used to convey the "business risk" exclusions are straightforward and without ambiguity. *Vobill Homes, Inc. v. Hartford Accident & Indem. Co., supra,* 179 *So.*2d at 497; *Home Indem. Co. v. Miller, supra,* 399 *F.*2d at 81; *Haugen v. Home Indem. Co.,* 197 *N.W.*2d 18, 22 (S.D.1972); *B. A. Green Co. v. Liberty Mutual Insurance Co., supra,* 517 *P.*2d at 565; *Eulich v. Home Indem. Co.,* 503 *S.W.*2d 846, 849 (Tex.Civ. Ct.App.1973); *Biebel Bros., Inc. v. United States Fidelity & Guar. Co., supra,* 522 *F.*2d at 1211; *Adams Tree Service, Inc. v. Hawaiian Insurance & Guar. Co., supra,* 573 *P.*2d at 80; *St. Paul Fire & Marine Insurance Co. v. Coss,* 80 *Cal.App.*3d 888, 145 *Cal.Rptr.* 836, 839 (Ct.App.1978); *Timberline Equipment Co., Inc. v. St. Paul Fire & Marine Insurance Co., supra,* 576 *P.*2d at 1246; *Overson v. United States Fidelity and Guar. Co., supra,* 587 *P.*2d at 151.

■ The clarity and effect of the "business risk" exclusion clauses is called into question only under a curious reading of the standard CGL. The court below indulged this reading of the

---

*Co.,* 522 *F.*2d 363, 366 (7th Cir. 1975). A variation of the current "business risk" exclusion clause wording, prepared as part of an optional "Broad Form Property Damage Endorsement" available as an alternative to standard CGL coverage, has also been upheld in its effect of excluding coverage for property damage to the insured's products or work. See, *e. g., Rafeiro v. American Employer's Insurance Co.,* 5 *Cal.App.*3d 799, 85 *Cal.Rptr.* 701, 708 (Ct.App. 1970); *St. Paul Fire & Marine Insurance Co. v. Coss,* 80 *Cal.App.*3d 888, 145 *Cal.Rptr.* 836, 840 (Ct.App.1978).

policy when it accepted Stone-E-Brick's argument that an ambiguity existed in the policy when the exclusions for "business risk" were read correlatively with another exclusion clause. This latter clause, denominated exclusion "(a)" in the policy, reads:

> This insurance does not apply:
> (a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner; * * *.

On the basis of three decisions which consider the proposed ambiguity between "(a)" and the "business risk" clauses discussed earlier, the Appellate Division found that the "co-existence" of the provisions "creates, at the very least, an ambiguity which must be resolved in favor of the insured so as to provide coverage." 155 *N.J.Super.* at 486. The import of the "business risk" exclusions is thereby rendered nugatory.

Because we are of the view that exclusion "(a)" cannot serve to becloud the clear import of the "business risk" exclusions, we necessarily disagree that an ambiguity exists in the policy before us. We have only recently reaffirmed the view that only genuine ambiguities engage the so-called "doctrine of ambiguity," see *DiOrio v. New Jersey Manufacturers Insurance Co.*, 79 *N.J.* 257, 269 (1979); and without intending in any wise to undercut the salutary effects of this "doctrine," we observe that it is, and indeed always has been, one of construction, simply an aid to the proper interpretation of terms devised by the professional underwriter. As Chief Justice Weintraub suggested in another context, such an aid "usually serves to describe a result rather than to assist in reaching it." *Reilly v. Ozzard*, 33 *N.J.* 529, 539 (1960).

We conceive a genuine ambiguity to arise where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. In that instance, application of the test of the objectively reasonable expectation of the insured often will result in benefits of coverage never intended from the insurer's point of view. The benefits granted, however, will pertain to the same landscape of risk as contemplated by the policy in issue, that is, the "doctrine of ambiguity" works to effectuate the consumer's expectation that the policy purchased extended greater coverage in the particular underwriting area. The rule of construction embraces ambiguities which are artificial, however, when the reading of coverage urged by the insured affords indemnity in an area of insurance completely distinct from that to which the policy applies in the first instance. To use an extreme example, no amount of semantical ingenuity can be brought to bear on a fire insurance policy so as to afford coverage for an intersection collision. Such an interpretation of a fire policy would hardly be based on any "objectively reasonable" expectation. See *DiOrio, supra,* 79 *N.J.* at 269.

In this case Stone-E-Brick's interpretation of the policy would result in coverage for repair and replacement of its own faulty workmanship. This interpretation relies on the supposition that the exception to exclusion "(a)"—"but this exclusion does not apply to a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner"—*grants* coverage for claims based on the warranty described. Not so. The contention runs directly counter to the basic principle that exclusion clauses *subtract* from coverage rather than grant it. Precisely this point was made by the Supreme Court of South Dakota, in construing the very clauses we have before us:

    * * * Exclusion (a) does not extend or grant coverage. To the contrary it is a limitation or restriction on the insuring clause. The exception to exclusion (a)

merely removes breach of implied warranty of fitness, quality or workmanship from the specific exclusion relating to contractual liability. The exception [to clause (a)] remains subject to and limited by all other related exclusions contained in the policy. When considered with exclusion (m) [(o) in the instant case] it clearly appears that property damage claims of third persons resulting from the insured's breach of an implied warranty are covered unless the claimed loss is confined to the insured's work or work product. [*Haugan v. Home Indem. Co., supra,* 197 *N.W.*2d at 22.]

To the same effect, see *St. Paul Fire & Marine Insurance Co. v. Coss, supra,* 145 *Cal.Rptr.* at 841.

As a variant of its argument that exclusion "(a)" grants the coverage it seeks, Stone-E-Brick contends that this exception, when read in conjunction with the "business risk" exceptions, is confusing in that coverage "granted" by the former clause is taken away by the latter two. 155 *N.J.Super.* at 486. But this argument too ignores the principle that

[e]ach exclusion is meant to be read with the insuring agreement, independently of every other exclusion. The exclusions should be read seriatim, not cumulatively. If any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions. There is no instance in which an exclusion can properly be regarded as inconsistent with another exclusion, since they bear no relationship with one another. [Tinker, *op. cit., supra.,* 25 *Feder.Ins.Couns.Q.* at 223.]

When presented with an identical claim of ambiguity as arising out of a comparison of exclusions "(a)" and the "business risk" clauses, the court in *Biebel Bros., Inc. v. United States F. & G. Co., supra,* stated flatly that the language of the exception in "(a) * * * has no application whatsoever to exclusions (*l*) [n] or (m) [*o*] * * *." 522 *F.*2d at 1212. We agree, and accordingly do not perceive any ambiguity in the instant policy.

We note in passing that each of the four decisions which has found an ambiguity in this standard CGL based upon the interpretation offered by Stone-E-Brick suffers from the same misconception that the exception to "(a)" grants coverage which must be viewed in conjunction with the exclusions in the "business risk" clauses. See *Fountainebleau Hotel Corp. v. United Filigree Corp.*, 298 *So.*2d 455, 459–60 (Fla.App.1974); *Federal Insurance Co. v. P. A. T. Homes, Inc.*, 113 *Ariz.* 136, 547 *P.*2d 1050, 1053 (Sup.Ct.1976); *Custom Roofing Co., Inc. v. Transamerica Insurance Co.*, 120 *Ariz.* 196, 584 *P.*2d 1187, 1189–90 (Ariz.App.1978); *Commercial Union Assurance Co. v. Gollan*, 394 *A.*2d 839, 841–42 (N.H.1978). The court below fell into error in relying entirely upon the reasoning of the first two cited cases.

But what does exclusion "(a)" mean and what is its function? As we have endeavored to make clear, the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident. See *Hamilton Die Cast, Inc. v. United States F. & G. Co.*, 508 *F.*2d 417, 420 (7th Cir. 1975); *Dreis & Krump Mfg. Co. v. Phoenix Insurance Co.*, 548 *F.*2d 681, 689 (7th Cir. 1977). Within this structure, contractual liability is excluded under the terms of exclusion "(a)". The exception to this exclusion insures, however, that claims premised upon quasi-contract or contract by implication, such as warranty actions, will be covered. Such claims must nevertheless be otherwise cognizable under the general grant of coverage in the first instance in order to constitute a claim "to which this insurance applies." This analysis of the import of the "(a)" exclusion accords with the generally-held view of other courts, see *e. g., Carboline Co. v. Home Indem. Co.*, 522 *F.*2d 363, 366 (7th Cir. 1975) (same construction given to similar clause in contractual liability policy); *Biebel Bros., Inc. v. United States F. & G. Co., supra*, 522 *F.*2d at 1212; *Haugan v. Home Indem. Co., supra*, 197 *N.W.*2d at 22; *Aetna Insurance Co. v. Pete*

*Wilson Roofing & Heating Co., Inc.*, 289 *Ala.* 719, 272 *So.*2d 232, 234–35 (1973) (contractual liability policy construed), and at the same time saves the clear import of the exclusions for "business risks."

## IV

The judgments under review are reversed and the matters remanded to the respective trial courts for entry there of judgments in favor of Pennsylvania National. No costs.

PASHMAN, J., dissenting.

I respectfully dissent. While the majority's analysis of the pertinent provisions of the insurance policy is not without appeal and likely constitutes the interpretation that would be given this contract by a legal scholar well-versed in insurance law, in my opinion these provisions are clearly ambiguous from the viewpoint of the average consumer of CGL coverage. Consequently, I would hold that in the present case the carrier is liable for any sums which its insured is ultimately deemed to owe to the plaintiffs.

In *Mazzilli v. Accident & Cas. Ins. Co.*, 35 *N.J.* 1 (1961), we set out certain principles applicable to the construction of all insurance policies. We there stated that:

> Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. * * * [D]oubts as to the existence of coverage must be resolved in favor of the insured. * * * [I]f the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied. [35 *N.J.* at 7–8]

Moreover, because insurance contracts are contracts of adhesion, based on standard forms, couched in technical language and prepared by the insurer's experts, they are to be construed in accordance with the reasonable expectations of the average insured. *See, e. g., Perrine v. Prudential Ins. Co.,* 56 *N.J.* 120, 126 (1970); *Allen v. Metropolitan Life Ins. Co.,* 44 *N.J.* 294, 305 (1965); *Bauman v. Royal Indem. Co.,* 36 *N.J.* 12, 25 (1961); *Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475, 482 (1961).

The CGL policy here at issue provides that its coverage does not apply

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; *but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;* * * * [emphasis supplied]

Thus, standing alone, this section of the policy provides that an insured's liability for replacement of defective materials or repair of substandard work is *not excluded* from coverage. An insured might therefore reasonably construe this language to mean that such coverage was in fact *included* within the policy's ambit. At the least, uncertainty—*i. e.,* ambiguity—would exist as to whether he was protected against this type of loss.

The majority, in order to demonstrate the non-existence of ambiguity, points to two other sections of the insurance policy:

This insurance does not apply

(n) to property damage to the named insured's products arising out of such products or any part of such products;

*        *        *        *        *        *        *        *

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

Standing alone, a fair reading of these provisions would seem to negate coverage for an insured's liability to replace defective materials or repair faulty work.

Thus, at first glance, this insurance policy appears to be internally inconsistent. Two sections negate coverage for the type of claim here being asserted against the insured. One section provides that such claims are not included in an exclusion.

As the majority notes, however, closer analysis reveals that these provisions can be harmonized. Merely because a particular item is not included in a specific exclusion, it does not necessarily follow that the item is covered under the policy. Consequently, an attorney familiar with the intricacies of insurance law and the rules of contract interpretation would likely have concluded that the CGL policy does not provide coverage in the circumstances here present.

CGL insurance, however, is not issued to lawyers. Rather, it provides coverage for those engaged in the construction or repair of improvements to real property. As such, our central inquiry must be whether this policy is ambiguous insofar as the average builder is concerned—not, as the majority emphasizes, whether a jurist who had scrutinized the contract would experience any doubts as to the policy's ambit.

In my view, and that of the courts of at least three jurisdictions, the average builder could reasonably have construed this contract as providing coverage for expenses incurred in order to replace defective materials and repair faulty work. *See, e. g., Federal Ins. Co. v. P. A. T. Homes, Inc.*, 113 *Ariz.* 136, 547 *P.2d* 1050 (Sup.Ct.1976); *Custom Roofing Co., Inc. v. Transamerica Ins. Co.*, 120 *Ariz.* 196, 584 *P.2d* 1187 (Ct.App.1978); *Fontainebleau Hotel Corp. v. United Filigree Corp.*, 298 *So.2d* 455, 459–460 (Fla.App.1974); *Commercial Union Assurance Co. v. Gollan*, 394 *A.2d* 839 (N.H.Sup.Ct.1978). Moreover, the insurer could easily have avoided this ambiguity by utilizing "more

precise language [which] * * * would have put the matter beyond reasonable question * * *." *Mazzilli, supra,* 35 *N.J.* at 7.

Consequently, despite the logical appeal of the majority's interpretation of this policy, I would uphold the reasonable expectations of the insured and rule that coverage exists.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD, SCHREIBER and HANDLER —6.

*For affirmance*—Justice PASHMAN—1.