979 So.2d 871 (2007)
UNITED STATES FIRE INSURANCE COMPANY, etc., Petitioner,
v.
J.S.U.B., INC., etc., et al., Respondents.
No. SC05-1295.
Supreme Court of Florida.
December 20, 2007.
*873 Ronald L. Kammer and Sina Bahadoran of Hinshaw and Culbertson, LLP, Miami, *874 Florida; June Galkoski Hoffman of Fowler, White, and Burnett, P.A., Miami, FL; Joseph R. Miele, Jr. of Marshall, Dennehey, Warner, Coleman, and Goggin, Fort Lauderdale, FL; and Donna M. Greenspan of Edwards, Angell, Palmer and Dodge, LLP, West Palm Beach, FL, for Petitioners.
Mark A. Boyle, Sr., Michael G. Fink and Geoffrey H. Gentile, Sr. of Fink and Boyle, P.A., Fort Myers, FL, for Respondents.
Denise V. Powers, Coral Gables, FL, on behalf of National Association of Mutual Insurance Companies; William D. Horgan of Fuller, Johnson, and Farrell, P.A., Tallahassee, FL, on behalf of Complex Insurance Claims Litigation Association; Pamela A. Chamberlin of Mitrani, Rynor, and Adamsky, P.A., Miami, FL, on behalf of Mid-Continent Casualty Company; John Bond Atkinson, Rebecca A. Brownell, and Ellie A. Levy of Atkinson and Brownell, P.A., Miami, FL, and Shaun McParland Baldwin and Donald E. Elder of Tressler, Soderstrom, Maloney and Priess, Chicago, IL, on behalf of Amerisure Mutual Insurance Company; Perry N. Bass, Houston, TX, and Christopher W. Martin and Levon G. Hovnatanian of Martin, Disiere, Jefferson and Wisdom, LLP, Houston, TX, on behalf of Hartford Fire Insurance Company; and David K. Miller and Ginger L. Barry of Broad and Cassel, Tallahassee, FL, and Keith Hetrick, Florida Home Builders Association, Tallahassee, FL, and R. Hugh Lumpkin and Michael F. Huber of Ver Ploeg and Lumpkin, P.A., Miami, FL, on behalf of Florida Home Builders Association, National Association of Home Builders, Arvida/JMB Partners, L.P., Arvida Managers, Inc., Arvida/JMB Management, L.P. and Mercedes Home Corporation; Warren H. Husband of Metz, Husband, and Daughton, P.A., Tallahassee, FL, and Patrick J. Wielinski of Cokinos, Bosien, and Young, P.C., Arlington, TX, on behalf of Associated General Contractors of America, Florida Associate General Contractors Council, Inc., the Associated General Contractors of Greater Florida, Inc., South Florida Chapter of the Associated General Contractors, Florida East Coast Chapter of the Associated General Contractors of America, Inc., American Subcontractors Association, Inc., and American Subcontractors of Florida, Inc.; Stephen A. Marino, Jr. of Ver Ploeg and Lumpkin, P.A., Miami, FL, on behalf of the Academy of Florida Trial Lawyers; Duane A. Daiker and Steven G. Schember of Shumaker, Loop, and Kendrick, LLP, Tampa, FL, on behalf of Amwest Surety Insurance Company; Daniel J. Santaniello and Paul Stephen Jones of Luks, Santaniello, Perez, Petrillo, and Gold, Orlando, FL, James P. Waczewski of Luks, Santaniello, Perez, Petrillo and Gold, Tallahassee, FL, and Joseph L. Oliva of Oliva and Associates, ALC, San Diego, CA, on behalf of Poole and Kent Company, for Amici Curiae.
PARIENTE, J.
J.S.U.B., Inc. seeks review of the decision of the Second District Court of Appeal in J.S.U.B., Inc. v. United States Fire Insurance Co., 906 So.2d 303 (Fla. 2d DCA 2005), which is in express and direct conflict with the decision of the Fourth District Court of Appeal in Lassiter Construction Co. v. American States Insurance Co., 699 So.2d 768 (Fla. 4th DCA 1997).[1] The conflict issue is whether a post-1986 standard form commercial general liability (CGL) policy with products-completed operations hazard coverage, issued to a general contractor, provides coverage when a claim is made against the contractor for *875 damage to the completed project caused by a subcontractor's defective work.
We answer this question in the affirmative. We conclude that defective work performed by a subcontractor that causes damage to the contractor's completed project and is neither expected nor intended from the standpoint of the contractor can constitute "property damage" caused by an "occurrence" as those terms are defined in a standard form commercial general liability policy. Accordingly, a claim made against the contractor for damage to the completed project caused by a subcontractor's defective work is covered under a post-1986 CGL policy unless a specific exclusion applies to bar coverage. In this case, the terms of the policy included an exception to the "Your Work" exclusion for faulty workmanship by a subcontractor and did not include a breach of contract exclusion. We therefore approve the Second District's decision in J.S.U.B. and disapprove the Fourth District's decision in Lassiter.

FACTS AND PROCEDURAL HISTORY
J.S.U.B., Inc., and Logue Enterprises, Inc., as partners of First Home Builders of Florida ("J.S.U.B."), contracted to build several homes in the Lehigh Acres area of Lee County, Florida. After completion and delivery of the homes to the homeowners, damage to the foundations, drywall, and other interior portions of the homes appeared. It is undisputed that the damage to the homes was caused by subcontractors' use of poor soil and improper soil compaction and testing. The homeowners demanded that J.S.U.B. repair or remedy the damages, asserting breach of contract, breach of warranty, negligence, strict liability, and violation of the Florida Building Code.
During the period in which the homes were built, J.S.U.B. was insured under a commercial general liability policy and renewal policy issued by United States Fire Insurance Company ("U.S. Fire"). The policies provide coverage for the "sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage'" caused by an "occurrence" within the "coverage territory" during the policy period. As defined in the policies, an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and "property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property." The policies also contain "products-completed operations hazard" coverage that
[i]ncludes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
. . . .
(2) Work that has not yet been completed or abandoned.[[2]]
The coverage provisions are limited by numerous exclusions. Of particular relevance are those exclusions, with their exceptions, that exclude coverage for damage to the insured's property and work:
j. Damage To Property
"Property damage" to:
. . . .
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf *876 are performing operations, if the "property damage" arises out of those operations; or
(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
. . . .
Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."
. . . .
1. Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
(Emphases supplied.)[3]
J.S.U.B. sought coverage under the policies for the structural damage to the homes and the damage to the homeowners' personal property. U.S. Fire agreed that the policies provided coverage for damage to the homeowners' personal property, such as the homeowners' wallpaper. However, U.S. Fire asserted that there was no insurance coverage for the costs of repairing the structural damage to the homes, such as the damage to the foundations and drywall.
J.S.U.B. made the necessary repairs to the homes and filed a declaratory judgment action to determine whether coverage existed for the cost of repairing the structural damage. The circuit court entered judgment in favor of U.S. Fire. Citing to LaMarche v. Shelby Mutual Insurance Co., 390 So.2d 325 (Fla.1980), the circuit court found that the CGL policies did not provide
coverage for faulty workmanship and that the damages alleged by [J.S.U.B.] and caused by [J.S.U.B.'s] subcontractors' use of poor soil, improper soil compaction and testing are the faulty workmanship for which no coverage exists under the subject policies.
J.S.U.B. appealed and the Second District Court of Appeal reversed. The Second District held that LaMarche did not control. The Second District further concluded that the policies contained "broad policy language" that provided coverage to J.S.U.B. in light of this Court's subsequent decision in State Farm Fire & Casualty Co. v. CTC Development Corp., 720 So.2d 1072 (Fla. 1998), and that none of the exclusions in the policies applied. See J.S.U.B., 906 So.2d at 309, 311.
Construing a CGL policy similar to those at issue in this case, the Fourth District Court of Appeal came to a contrary conclusion in Lassiter. In that case, the contractor argued that because exclusions (j)(6) and (l) "do not exclude work performed by subcontractors, there is coverage for the defective work performed by subcontractors." Lassiter, 699 So.2d at 770. The Fourth District disagreed, summarily concluding that "[t]he insured has failed to demonstrate that there are any *877 provisions in the coverage section of the policy which would provide coverage for this defective work." Id. We accepted jurisdiction to resolve the conflict between J.S.U.B. and Lassiter.

ANALYSIS
The issue we decide is whether a post-1986 standard form commercial general liability policy with products-completed operations hazard coverage, issued to a general contractor, provides coverage when a claim is made against the contractor for damage to the completed project caused by a subcontractor's defective work.[4] This is an issue of insurance policy construction, which is a question of law subject to de novo review. See Fayad v. Clarendon Nat'l Ins. Co., 899 So.2d 1082, 1085 (Fla.2005).
In resolving this issue, we first set forth the standards for construing insurance contracts and outline the origin and evolution of CGL policies, highlighting the changes that have been made to the relevant language of the insuring provisions and exclusions over the years. We then review our decision in LaMarche, which has been relied on by courts to deny coverage for damage to a completed project caused by a subcontractor's defective work. We then analyze whether under CGL policies issued after 1986, a subcontractor's faulty workmanship can constitute an "occurrence" as that term is defined in the policy and as interpreted in CTC Development. Finally, we analyze the definition of "property damage" to determine whether the damage to the completed homes comes within the policy definition.
A. Standards for Construing Insurance Contracts
Our interpretation of insurance contracts, such as the CGL policies in this case, is governed by generally accepted rules of construction. Insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage. See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So.2d 528, 532 (Fla. 2005). Further, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000). Accordingly, "[a]lthough exclusionary clauses cannot be relied upon to create coverage, principles governing the construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read in pari materia." CTC Development, 720 So.2d at 1074-75 (citations, alteration, and internal quotation marks omitted).
B. The Origin and Evolution of CGL Policies
Commercial General Liability policies are designed to protect an insured against certain losses arising out of business operations. See Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 305 (Tenn.2007). The first standard form comprehensive general liability insurance policy was drafted by the insurance industry in 1940. See 21 Eric Mills Holmes, Holmes' Appleman on Insurance 2d, § 129.1, at 7 (2002).[5] The standard policy was the result of a voluntary *878 effort in the insurance industry to address the misunderstanding, coverage disputes, and litigation that resulted from the unique language used by each liability insurer. See id.; see also Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp., 636 So.2d 700, 702 (Fla.1993) (explaining that CGL policies "are standard insurance policies developed by insurance industry trade associations, and these policies are the primary form of commercial insurance coverage obtained by businesses throughout the country").
Since 1940, the standard policy has been revised several times. See 21 Holmes, supra, § 129.1, at 7-8. We review these changes because the insuring agreement has been expanded over the years and the exclusions narrowed. With regard to the insuring agreement, the language was expanded from providing coverage only for damages "caused by an accident" to include coverage for damages caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Compare 16 id. § 117.1, at 215, with 20 id. § 129.2, at 104. In CTC Development, we explained that an "occurrence," which is defined as an "accident," encompasses damage that is "neither expected nor intended from the standpoint of the insured." 720 So.2d at 1076.
Like the insuring language, the exclusions in standard CGL policies have been modified over the years. See generally 21 Holmes, supra, § 132.1-132.9, at 5-158. The exclusions that are of significance to our analysis in this case are the "business risk" exclusions, including the "your work" and "your product" exclusions. The 1973 standard CGL policy interpreted in LaMarche contained broad exclusions for damage to "your work" and "your product" stating that the insurance did not apply
(n) to property damage to the named insured's products arising out of such products or any part of such products; (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.
390 So.2d at 326, 21 Holmes, supra, § 132.1, at 11 (emphasis supplied).
Beginning in 1976, the insured could purchase a Broad Form Property Endorsement. See Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 83 (2004). This endorsement replaced exclusion (o), set forth above, and exclusion (k), which excluded damage to property owned by or within the control of the insured. As to exclusion (o), the endorsement replaced it with more specific exclusions and also differentiated between property damage that occurred before and after operations were completed. The endorsement provided that the insurance did not apply:
(d) to that particular part of any property . . .
(i) upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out of such operations, or
(ii) out of which any property damage arises, or
(iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured; . . .
(3) with respect to the completed operations hazard and with respect to any classification stated in the policy or the company's manual as "including completed operations," to property damage to work performed by the *879 named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.
21 Holmes, supra, § 132.9, at 149 (emphasis supplied). Thus, with regard to completed operations, the endorsement eliminated the exclusion for "work performed on behalf of the named insured."
When the CGL policy was revised again in 1986, it contained new provisions that incorporated and clarified the Broad Form Property Endorsement. See id. at 149, 153. New exclusion (j)(6) and the exception to this exclusion clearly stated that the exclusion for faulty workmanship did not apply to work within the products-completed operation hazard:
This insurance does not apply to:
j. Damage to Property
"Property damage" to:
. . . .
(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
. . . .
Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."
Id. at 145, 153 (emphasis supplied). The 1986 policy also added new exclusion (l), the "your work exclusion," with an express exception for subcontractor work as follows:
This insurance does not apply to:
. . . .
l. Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
Id. at 145, 152 (emphasis supplied). The reason for this 1986 revision that added the subcontractor exception has been explained as follows:
[T]he insurance and policyholder communities agreed that the CGL policy should provide coverage for defective construction claims so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself. This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage.
See 2 Jeffrey W. Stempel, Stempel on Insurance Contracts § 14.13[D] at 14-224.8 (3d ed. Supp.2007). Moreover, the Insurance Services Office promulgated a circular on July 15, 1986, confirming that the 1986 revisions to the standard CGL policy not only incorporated the "Broad Form" property endorsement but also specifically "cover[ed] damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor's work after the insured's operations are completed." Insurance Services Office Circular, Commercial General Liability Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986).[6] Of *880 course, the subcontractor's exception to the general exclusion for a contractor's defective work becomes important only if there is coverage under the initial insuring provision.
C. LaMarche
The threshold issue in this case, whether a subcontractor's defective work can constitute an "occurrence," requires us to examine our decision in LaMarche because it is the Florida case that is generally cited to support the proposition that CGL policies do not provide coverage for damage to the contractor's work caused by faulty workmanship. The issue in LaMarche involved a claim for a contractor's faulty workmanship, which the homeowners argued caused structural defects and consequent secondary damage. See Shelby Mut. Ins. Co. v. LaMarche, 371 So.2d 198, 200 (Fla. 2d DCA 1979). The contractor entered into an agreement for the construction of a home, under which all workmanship with regard to the structure was guaranteed for five years from the date of delivery. See LaMarche, 390 So.2d at 326. The CGL policy issued to the contractor provided that the insurer "would pay for bodily injury or property damage for which the contractor became liable." Id. However, the policy also included the following relevant exclusionary provisions, which were standard in 1973 CGL policies:
(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warrant[y] of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;
(n) to property damage to the named insured's products arising out of such products or any part of such products; (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith[.]
Id.
The work performed by the contractor was defective, and the homeowners, as beneficiaries under the insurance contract, sought coverage for replacing the defective materials and workmanship. The homeowners argued that
the average person would interpret subparagraph (a) as granting coverage for damages arising from a breach of warranty of fitness or a failure to perform work in a workmanlike manner. Petitioners further argue that the homeowner, as beneficiary of the insured, should be granted coverage because the policy is ambiguous.
Id. The Court rejected both contentions, ruling that "[t]he district court was correct in concluding that an exclusion does not provide coverage but limits coverage." Id.
The Court noted that the district court's decision was consistent with the majority of other jurisdictions, which had concluded that "the purpose of this comprehensive liability insurance coverage is to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product." Id. The Court reasoned that this interpretation was consistent with the intent of the parties as *881 evidenced by the language of the exclusions:
We find this interpretation was not the intent of the contractor and the insurance company when they entered into the subject contract of insurance, and the language of the policy clearly excludes this type of coverage.
Id.
Thus, although LaMarche used broad language regarding the purpose of CGL policies, LaMarche's ultimate determination that there was no coverage for repair and replacement of the contractor's own defective work was based on the policy exclusions, not the insuring provisions. This is evident for several reasons.
First, the issue before the district court in LaMarche was whether the "three exclusions [at issue in the CGL policy] are clear and unambiguous" and the court's decision, which this Court fully approved, stated:
In resolving the issue raised on appeal we make no decision as to whether the policy expressly provides coverage for the damage which resulted to appellees' residence. That question is not before us. We hold only that the exclusions at issue here do not create an ambiguity.
371 So.2d at 200-01. Accordingly, the issue on appeal to this Court was whether the district court correctly concluded that the exclusions were clear and unambiguous, which is apparent by this Court solely discussing the issue of coverage in terms of the exclusions. Indeed, the Court found that "the language of the policy clearly excludes this type of coverage," which is further evidence that the Court's decision was based on the exclusions. LaMarche, 390 So.2d at 326. We agree with the Second District in J.S.U.B., which recognized this distinction:
Our decision [in LaMarche] specified that we were not deciding whether the CGL policy expressly provided coverage for the damage that had been incurred, but rather, we determined that the policy exclusions that were at issue did not create an ambiguity. Id. at 201. In its review of our decision, the supreme court also focused on the exclusionary language and concluded that the policy excluded coverage for building flaws or deficiencies and "instead covers damage caused by these flaws." LaMarche, 390 So.2d at 326.
906 So.2d at 307-08.
Second, the Court in LaMarche adopted in full the reasoning and analysis of the New Jersey Supreme Court's decision in Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788, 792 (1979), which was based on the same exclusions at issue in LaMarche; specifically, the "insured products" (exclusion "(n)") and "work performed" (exclusion "(o)") exclusions. The Weedo court explained that the insuring provisions "set forth, in fundamental terms, the general outlines of coverage," while "[t]he limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded." Id. at 790. The court then noted that the insurer conceded that
but for the exclusions in the policy, coverage would obtain. Hence we need not address the validity of one of the carrier's initially-offered grounds of non-coverage, namely, that the policy did not extend coverage for the claims made even absent the exclusions.
Id. at 790 n. 2.
The New Jersey Supreme Court concluded that coverage was lacking, not due to the insuring provisions, but because faulty workmanship by a contractor was specifically excluded based on the clear and unambiguous "business risk" exclusionary *882 clauses. Id. at 792-95 (concluding that the language of these "business risk" exclusions was clear and rejecting the argument that these exclusions were rendered ambiguous when read in conjunction with exclusion (a)). Additionally, the Court reinforced that it was looking to the exclusions to determine if coverage existed by stating the principle that "[t]he limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded." Id. at 790. Thus, it is clear that LaMarche relied on the exclusions to determine that no coverage existed in that case.
U.S. Fire and the amici curiae that support its position argue that LaMarche and the district court decisions that reiterate LaMarche's broad language regarding the purpose of CGL policies stand for the proposition that faulty workmanship that damages the contractor's own work can never constitute a covered "occurrence." See, e.g., Sekura v. Granada Ins. Co., 896 So.2d 861, 862 (Fla. 3d DCA 2005); Lassiter, 699 So.2d at 769; Home Owners Warranty Corp. v. Hanover Ins. Co., 683 So.2d 527, 529 (Fla. 3d DCA 1996); Tucker Constr. Co. v. Michigan Mut. Ins. Co., 423 So.2d 525, 527-28 (Fla. 5th DCA 1982). We disagree. Although some of these district court decisions may have reached the correct result under their particular facts, none of them expressly considered whether it is appropriate to apply LaMarche's rationale to cases involving different policy provisions.[7]
We conclude that the holding in LaMarche, which relied on Weedo and involved the issue of whether there was coverage for the contractor's own defective work, was dependent on the policy language of pre-1986 CGL policies, including the relevant insuring provisions and applicable exclusions. The Minnesota Supreme Court, the Tennessee Supreme Court, and the Wisconsin Supreme Court reached the same conclusion regarding prior state court decisions that relied on Weedo and interpreted pre-1986 CGL policies. See Wanzek Constr., Inc. v. Employers Ins. of Wausau, 679 N.W.2d 322, 327 (Minn.2004); Moore & Assocs., Inc., 216 S.W.3d at 307; Am. Girl, 673 N.W.2d at 77.
Because LaMarche involved a claim of faulty workmanship by the contractor, rather than a claim of faulty workmanship by the subcontractor, and because the policy being interpreted involved distinct exclusions and exceptions, we do not regard LaMarche as binding precedent in this case. The role of precedent in insurance policy interpretation cases depends largely on whether the underlying facts and the policies at issue in the two decisions are similar. Indeed, precedent has been defined as "A decided case that furnishes a basis for determining later cases involving similar facts or issues." Black's Law Dictionary 1214 (8th ed.2004) (emphasis supplied). Thus, whether a decision is binding on another is dependent upon there being similar facts and legal issues. As Justice Overton observed in his concurrence in Perez v. State, 620 So.2d 1256, 1259 (Fla. 1993),
[t]he doctrine of precedent is basic to our system of justice. In simple terms, *883 it ensures that similarly situated individuals are treated alike rather than in accordance with the personal view of any particular judge. In other words, precedent requires that, when the facts are the same, the law should be applied the same.
However, where the policies and underlying facts are different, then a previous decision should not be binding. We recognized this principle in Travelers Indemnity Co. v. PCR, Inc., 889 So.2d 779, 791 n. 13 (Fla.2004) (questioning the applicability of a previous decision's definition of a policy term in a subsequent case where the exclusionary clauses were materially different).
Accordingly, our decision in LaMarche does not control the resolution of the issue in this case, namely, whether a subcontractor's faulty workmanship is covered in a post-1986 CGL policy. Instead, we first analyze the specific insuring provisions of the current policy to determine whether a subcontractor's faulty workmanship that results in damage to the contractor's work can constitute an "occurrence" as that term has been defined under Florida case law. In doing so, we apply well-established principles of insurance contract interpretation, reading the policy both in accord with its plain language, construing any ambiguities in favor of the insured, see Taurus Holdings, 913 So.2d at 532, and "as a whole, endeavoring to give every provision its full meaning and operative effect." Anderson, 756 So.2d at 34.
D. Whether Faulty Workmanship Can Constitute an "Occurrence"
The question of whether faulty workmanship can constitute an "occurrence" is a matter governed by the actual terms of the policy and Florida law interpreting insurance contracts. The policy and renewal policy in this case define an "occurrence" as an "accident" but leave "accident" undefined. Thus, under our decision in CTC Development, these policies provide coverage not only for "`accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured." 720 So.2d at 1076.
U.S. Fire nevertheless argues that a subcontractor's faulty workmanship that damages the contractor's own work can never be an "accident" because it results in reasonably foreseeable damages. We expressly rejected the use of the concept of "natural and probable consequences" or "foreseeability" in insurance contract interpretation in CTC Development when we receded from prior case law. See id. at 1074-77.
Further, we fail to see how defective work that results in a claim against the contractor because of injury to a third party or damage to a third party's property is "unforeseeable," while the same defective work that results in a claim against the contractor because of damage to the completed project is "foreseeable." This distinction would make the definition of "occurrence" dependent on which property was damaged. For example, applying U.S. Fire's interpretation in this case would make the subcontractor's improper soil compaction and testing an "occurrence" when it damages the homeowners' personal property, such as the wallpaper, but not an "occurrence" when it damages the homeowners' foundations and drywall. As the Tennessee Supreme Court explained, in rejecting this distinction:
A shingle falling and injuring a person is a natural consequence of an improperly installed shingle just as water damage is a natural consequence of an improperly installed window. If we assume that either the shingle or the window installation will be completed negligently, it is foreseeable that damages will result. If, however, we assume that the installation *884 of both the shingle and the window will be completed properly, then neither the falling shingle nor the water penetration is foreseeable and both events are "accidents." Assuming that the windows would be installed properly, Moore could not have foreseen the water penetration. Because we conclude the water penetration was an event that was unforeseeable to Moore, the alleged water penetration is both an "accident" and an "occurrence" for which there is coverage under the "insuring agreement."
Moore & Assocs., 216 S.W.3d at 309.
We also conclude that U.S. Fire's argument that a breach of contract can never result in an "accident" is not supported by the plain language of the policies. The Wisconsin Supreme Court came to the same conclusion in American Girl:
[T]here is nothing in the basic coverage language of the current CGL policy to support any definitive tort/contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. "Occurrence" is not defined by reference to the legal category of the claim. The term "tort" does not appear in the CGL policy.
673 N.W.2d at 77. The Kansas Supreme Court followed American Girl's reasoning in holding that a subcontractor's defective work can constitute an "occurrence" under Kansas law. See Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co., 281 Kan. 844, 137 P.3d 486, 491 (2006).[8]
If U.S. Fire intended to preclude coverage based on the cause of action asserted, it was incumbent on U.S. Fire to include clear language to accomplish this result. See Container Corp. of Am. v. Maryland Cas. Co., 707 So.2d 733, 736 (Fla.1998) ("Had Maryland wished to limit Container's coverage to vicarious liability, it could have done so by clear policy language."). In fact, there is a breach of contract endorsement exclusion, not present in the CGL policies at issue in this case, that excludes coverage for breach of contract claims. See B. Hall Contracting Inc. v. Evanston Ins. Co., 447 F.Supp.2d 634, 639 (N.D.Tex.2006). The endorsement provides:
This insurance does not apply to claims for breach of contract, whether express or oral, nor claims for breach of an implied in law or implied in fact contract, whether "bodily injury," "property damage," "advertising injury," "personal injury" or an "occurrence" or damages of any type is alleged; this exclusion also applies to any additional insureds under this policy.
Id.
Furthermore, ISO has begun to issue an endorsement that may be included in a CGL policy, which entirely eliminates the subcontractor exception to the "your work" exclusion. See ISO Properties, Inc., Endorsement CG 22 94 10 01, http://www. lexis.com; see also Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 12 (Tex.2007) ("More recently, the Insurance Services Office has issued an endorsement that may be included in the CGL to eliminate the subcontractor exception to the `your work' exclusion."). The fact that these additional endorsements may be included in CGL policies highlights that the ultimate analysis is governed by the actual *885 language contained in the applicable insurance contract.
U.S. Fire's assertion that damage resulting from a breach of contract must be presumed to be expected is also unpersuasive. As with U.S. Fire's foreseeability argument, this position makes the definition of "occurrence" dependent on whether the property damaged is part of the construction contract or the homeowner's separate property. Under CTC Development, the appropriate consideration is whether the damage was expected or intended from the standpoint of the insured, not whose property was damaged. 720 So.2d at 1076; see also Lamar Homes, 242 S.W.3d at 9 ("The CGL policy, however, does not define an `occurrence' in terms of the ownership or character of the property damaged by the act or event. Rather, the policy asks whether the injury was intended or fortuitous, that is, whether the injury was an accident."). As the amici Florida Home Builders Association and National Association of Home Builders assert in arguing that CGL policies issued to their members do not distinguish between the property damaged for purposes of defining "occurrence":
If a defective masonry wall falls outward and damages a parked car, no one disputes the "occurrence" of "property damage," but if it falls inward and damages the floor, the insurers label that a non-occurrence or not property damage. Likewise, if the wall falls the day before the home buyer resells to a new owner, they contend it is not covered as a contract claim, but if it falls the day after resale, it is covered as a tort claim.
(Citation omitted.)
In sum, we reject a definition of "occurrence" that renders damage to the insured's own work as a result of a subcontractor's faulty workmanship expected, but renders damage to property of a third party caused by the same faulty workmanship unexpected. There is simply nothing in the definition of the term "occurrence" that limits coverage in the manner advanced by U.S. Fire, and we decline to read the broad "business risk" exclusions at issue in LaMarche into the definition of "occurrence" used in the coverage provisions of the post-1986 standard CGL policies at issue in this case. We agree with the Wisconsin Supreme Court's observation that
CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an "occurrence" within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law.
Am. Girl, 673 N.W.2d at 76; accord Moore & Assocs., 216 S.W.3d at 307 (agreeing with American Girl that "[r]eliance upon a CGL's `exclusions' to determine the meaning of `occurrence' has resulted in `regrettably overbroad generalizations' concerning CGLs").
Although the Supreme Courts of Kansas, Minnesota, Tennessee, Texas and Wisconsin have adopted a similar interpretation of the term "occurrence" as we do in this case, we recognize that there is an opposing view that defective construction that damages the work product itself can never constitute an accident. See, e.g., Auto-Owners Ins. Co. v. Home Pride Cos., 268 Neb. 528, 684 N.W.2d 571, 577 (2004); Oak Crest Constr. Co. v. Austin Mut. Ins. Co., 329 Or. 620, 998 P.2d 1254, 1257 (2000); Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 589 Pa. 317, 908 A.2d 888, 899 (2006); L-J, *886 Inc. v. Bituminous Fire & Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33, 35-36 (2005).[9] However, contrary to our interpretation of the term "accident" in CTC Development, these courts construe "accident" narrowly. See Home Pride Cos., 684 N.W.2d at 577 (concluding that faulty workmanship is not an "accident" because it is not a fortuitous event); Kvaerner Metals, 908 A.2d at 899 (same); Oak Crest, 998 P.2d at 1257 (concluding that faulty workmanship is not an "occurrence" because it is a failure to perform under the contract, which cannot be characterized as unexpected); L-J, Inc., 621 S.E.2d at 35 (same). Moreover, a number of these courts support their decisions by reciting broad principles that categorically dismiss claims for damages caused by defective work as being outside the scope of CGL policies. See, e.g., Oak Crest, 998 P.2d at 1257 n. 7; Kvaerner Metals, 908 A.2d at 899 n. 10; L-J, Inc., 621 S.E.2d at 35. Because these courts allow recovery when the faulty workmanship injures a third party or results in damage to property other than the work product itself, the implication from these cases is that damage to the insured's own work from failure to perform a construction contract is presumed to be expected while damage to the person or property of a third party is presumed to be unexpected. As explained above, we find this reasoning unconvincing and contrary to policy language defining "occurrence."
Even if there was any ambiguity in the policies as to whether a subcontractor's faulty workmanship can constitute an "occurrence," we would interpret the ambiguity against the insurer and in favor of coverage. See Taurus Holdings, 913 So.2d at 532. In addition, our interpretation of the term "occurrence" is guided by a view of the policy as a whole. See Anderson, 756 So.2d at 34. As we explained in CTC Development, "[a]lthough exclusionary clauses cannot be relied upon to create coverage, principles governing the construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read in pari materia." 720 So.2d at 1074-75 (citations, alteration, and internal quotation marks omitted).
In this case, if the insuring provisions do not confer an initial grant of coverage for faulty workmanship, there would be no reason for U.S. Fire to exclude damage to "your work":
If . . . losses actionable in contract are never CGL "occurrences" for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary. The business risk exclusions eliminate coverage for liability for property damage to the insured's own work *887 or product-liability that is typically actionable between the parties pursuant to the terms of their contract, not in tort. If the insuring agreement never confers coverage for this type of liability as an original definitional matter, then there is no need to specifically exclude it. Why would the insurance industry exclude damage to the insured's own work or product if the damage could never be considered to have arisen from a covered "occurrence" in the first place?
Am. Girl, 673 N.W.2d at 78; accord Lamar Homes, Inc., 242 S.W.3d at 12 ("By incorporating the subcontractor exception into the `your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance.")
In addition, a construction of the insuring agreement that precludes recovery for damage caused to the completed project by the subcontractor's defective work renders the "products-completed operations hazard" exception to exclusion (j)(6) and the subcontractor exception to exclusion (l) meaningless. See Lee Builders, 137 P.3d at 494 (stating that "the `Damage to Your Work' business risk exclusion in the CGL policy in the instant case supports the determination of an occurrence" because "[i]f there can be no occurrence, the exclusionand its exceptionappear to be superfluous"); Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 673 (Tex.App. 2006) ("[F]inding no occurrence for defective construction resulting in damage to the insured's work would render the subcontractor exception superfluous and meaningless."), petition for review filed, No. 06-287 (Tex. May 11, 2006).[10] Paragraph (j)(6) specifically excludes from coverage that "particular part of any property that must be restored, repaired or replaced because `your work' was incorrectly performed on it." However, the policy goes on to provide an exception by stating that "[p]aragraph (6) of this exclusion does not apply to `property damage' included in the `products-completed operations hazard.'" Exclusion (l) excludes damage to "`your work' arising out of it or any part of it and included in the `products-completed operations-hazard'" but then provides an exception that states that this "exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (Emphasis supplied.) We simply cannot ignore the exception that has now been incorporated into exclusion (l), an exception that clearly applies to damages to the insured's own work arising out of the work of a subcontractor. Reading these provisions in pari materia with the insuring agreement supports the conclusion that a subcontractor's defective work that results in damage to the completed project can constitute an "occurrence."
Finally, we reject U.S. Fire's contention that construing the term "occurrence" to include a subcontractor's defective work converts the policies into performance bonds. "The purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor." Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195, 198 (Fla.1992). Thus, unlike an insurance policy, a performance bond benefits the owner of a project rather than the contractor. Cf. School Bd. of Palm Beach County v. Vincent J. Fasano, Inc., 417 *888 So.2d 1063, 1065 n. 3 (Fla. 4th DCA 1982) ("On private construction projects performance bonds are usually secured for the benefit of the owner. . . ."). Further, a surety, unlike a liability insurer, is entitled to indemnification from the contractor. See Western World Ins. Co. v. Travelers Indem. Co., 358 So.2d 602, 604 (Fla. 1st DCA 1978); see also Fidelity & Deposit Co. of Md. v. Hartford Cas. Ins. Co., 189 F.Supp.2d 1212, 1218 (D.Kan.2002) (rejecting the argument that "if the structural damage caused by faulty workmanship constitutes an `occurrence,' then the CGL and umbrella policies will be transformed into a performance bond" because the bond "in no way" protected the contractor or subcontractor from liability).
The Texas Court of Appeals explained the salient differences between a liability policy and a performance bond:
[A]lthough defective construction may constitute an "occurrence," the insurer indemnifies the insured only for resulting "property damage" arising after the project is completed. In contrast, a performance bond is broader than a CGL policy in that it guarantees "the completion of a construction contract upon the default of the general contractor." Therefore, a "variety of deficiencies that do not constitute `property damage' may be covered by a performance bond, and not all deficiencies cause additional property damage." Consequently, allowing coverage for some "property damage" resulting from defective construction does not transform a CGL policy into a performance bond and require a CGL carrier to pay anytime an insured fails to complete, or otherwise comply with, its contract.
Lennar Corp., 200 S.W.3d at 673-74 (footnote and citations omitted) (quoting Black's Law Dictionary 1158 (7th ed.1999) and O'Shaughnessy v. Smuckler Corp., 543 N.W.2d 99, 105 (Minn.Ct.App.1996)); accord Lamar Homes, Inc., 242 S.W.3d at 10 & n. 7 ("[T]he protection afforded by a performance bond is, in fact, different from that provided by [a] CGL insurance policy. . . . [A]n insurance policy spreads the contractor's risk while a bond guarantees its performance. An insurance policy is issued based on an evaluation of risks and losses that is actuarially linked to premiums; that is, losses are expected. In contrast, a surety bond is underwritten based on what amounts to a credit evaluation of the particular contractor and its capabilities to perform its contracts, with the expectation that no losses will occur. Unlike insurance, the performance bond offers no indemnity for the contractor; it protects only the owner."). The Supreme Court of Tennessee also rejected this argument, recognizing that the fact that damages may result from an "occurrence" under a CGL policy is only the first step in determining whether the damages are covered. Moore & Assocs., 216 S.W.3d at 309. The "occurrence" may not have caused "property damage" or coverage provided by the insuring agreement may be precluded by an exclusion.
We hold that faulty workmanship that is neither intended nor expected from the standpoint of the contractor can constitute an "accident" and, thus, an "occurrence" under a post-1986 CGL policy. In this case, we conclude that the subcontractors' defective soil preparation, which J.S.U.B. did not intend or expect, was an "occurrence." However, in order to determine whether the policies provide coverage for J.S.U.B.'s losses, we must next address whether the "occurrence" caused "property damage" within the meaning of the policies.
E. Whether the Subcontractors' Improper Soil Preparation Caused "Property Damage"
The CGL policies define "property damage" as "[p]hysical injury to *889 tangible property, including all resulting loss of use of that property." U.S. Fire and the amici that argue in favor of its position assert that faulty workmanship that injures only the work product itself does not result in "property damage." However, just like the definition of the term "occurrence," the definition of "property damage" in the CGL policies does not differentiate between damage to the contractor's work and damage to other property.[11]
We further reject U.S. Fire's contention that there can never be "property damage" in cases of faulty construction because the defective work rendered the entire project damaged from its inception. To the contrary, faulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused "physical injury to tangible property" within the plain meaning of the definition in the policy. If there is no damage beyond the faulty workmanship or defective work, then there may be no resulting "property damage."
Both the Third and Fifth District Courts of Appeal have recognized this distinction. See West Orange Lumber Co. v. Indiana Lumbermens Mut. Ins. Co., 898 So.2d 1147, 1148 (Fla. 5th DCA 2005); Auto Owners Ins. Co. v. Tripp Constr., Inc., 737 So.2d 600, 601 (Fla. 3d DCA 1999). In Tripp, although the Third District cited LaMarche, the court differentiated between a claim for the costs of repairing and replacing the actual defects in the construction, which it held was not covered, and a claim for the costs of repairing the damage caused by construction defects "to other elements of the subject homes," which it held was covered. 737 So.2d at 601-02. In West Orange, the Fifth District held that there was no allegation of "property damage" when the only damage alleged was the cost of removing and replacing the wrong grade cedar siding that had been installed. 898 So.2d at 1148.
Other courts have also recognized that there is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for "property damage," and a claim for the costs of repairing damage caused by the defective work, which is a claim for "property damage." See, e.g., Cincinnati Ins. Co. v. Venetian Terrazzo, Inc., 198 F.Supp.2d 1074, 1079 n. 1 (E.D.Mo.2001) (concluding that costs of repair and replacement of an improperly installed floor was not covered "property damage"); Lennar Corp., 200 S.W.3d at 679-80 (distinguishing between costs to remove and replace defective stucco as a preventative measure, which were not "damages because of . . . property damage," and the costs to repair water damage that resulted from the application of the defective stucco, which were "damages because of . . . property damage"). As the Supreme Court of Tennessee explained:
[A] "claim limited to faulty workmanship or materials" is one in which the sole damages are for replacement of a defective component or correction of faulty installation.

*890 We conclude that Hilcom's claim is not limited to faulty workmanship and does in fact allege "property damage." Moore's subcontractor allegedly installed the windows defectively. Without more, this alleged defect is the equivalent of the "mere inclusion of a defective component" such as the installation of a defective tire, and no "property damage" has occurred. The alleged water penetration is analogous to the automobile accident that is caused by the faulty tire. Because the alleged defective installation resulted in water penetration causing further damage, Hilcom has alleged "property damage." Therefore, we conclude that Hilcom has alleged damages that constitute "property damage" for purposes of the CGL.
Moore & Assocs., 216 S.W.3d at 310; see also Am. Girl, 673 N.W.2d at 74-75 ("The sinking, buckling, and cracking of the [warehouse] as a result of soil settlement qualifies as `physical injury to tangible property.'").
Like the Tennessee case, Moore & Assocs., and the Wisconsin case, American Girl, this case does not involve a claim for the cost of repairing the subcontractor's defective work, but rather a claim for repairing the structural damage to the completed homes caused by the subcontractor's defective work. Specifically, it was the subsequent soil settlement due to the subcontractor's faulty workmanship that caused the structural damage to the homes. Because there was "physical injury to tangible property," we conclude that the structural damage to the homes is "property damage" within the meaning of the policies.
In reaching this conclusion, we discern no public policy reason for precluding coverage. A subcontractor's defective work that is neither intended nor expected from the standpoint of the insured is not the type of intentional wrongful act that we have held was uninsurable as a matter of public policy. See Ranger Ins. Co. v. Bal Harbour Club, Inc., 549 So.2d 1005, 1009 (Fla.1989) (holding that public policy prohibits the insured from being indemnified for a loss resulting from intentional employment discrimination). Even if a "moral hazard" argument could be made regarding the contractor's own work, the argument is not applicable for the subcontractors' work:
Providing coverage for claims arising out of the subcontractor work also made sense in terms of meeting the moral hazard and adverse selection problems associated with faulty workmanship claims. Although it may be unwise to provide liability coverage for a builder directing its own crews, who may be tempted to cut corners if insured, the same rationale did not as readily apply to modern construction that depends heavily on subcontractors on whom general contractors depend. . . . Particularly if the subcontractor does soil, concrete, or framing work, it is as a practical matter very difficult for the general contractor to control the quality of the subcontractor work. Only if the contractor has a supervisor at the elbow of each subcontractor at all times can quality control be relatively assuredbut this would be prohibitively expensive. Because the general contractor depends on the subcontractor to a large degree, the general contractor is not tempted by moral hazard to the degree that makes the consequences of faulty subcontractor work more expensive to insure.
Stempel, supra, § 14.13[D], at 14-224.8. Further, the argument that indemnity will create a windfall for the contractor is speculative. As the amici point out, the contractor gains nothing if insurance reimburses the costs of repairing the damage *891 caused by the defective work. Moreover, if the insurer decides that this is a risk it does not want to insure, it can clearly amend the policy to exclude coverage, as can be done simply by either eliminating the subcontractor exception or adding a breach of contract exclusion.

CONCLUSION
We conclude that faulty workmanship that is neither intended nor expected from the standpoint of the contractor can constitute an "accident" and thus an "occurrence" under a post-1986 standard form CGL policy. We further conclude that physical injury to the completed project that occurs as a result of the defective work can constitute "property damage" as defined in a CGL policy. Accordingly, we hold that a post-1986 standard form commercial general liability policy with products completed-operations hazard coverage, issued to a general contractor, provides coverage for a claim made against the contractor for damage to the completed project caused by a subcontractor's defective work provided that there is no specific exclusion that otherwise excludes coverage. In so holding, we distinguish but do not recede from LaMarche because that case concluded, based on the policy exclusions, that there was no coverage under a pre-1986 CGL policy for the repair and replacement of the contractor's own defective work.
In this case, because there are no exclusions that bar coverage, we agree with the Second District's conclusion that the CGL policies issued by U.S. Fire to J.S.U.B. provide coverage for the costs to replace the homeowner's personal property, such as their wallpaper, as well as the costs to repair the structural damage to the homes, such as the walls, both of which were caused by the subcontractors' improper soil preparation. Accordingly, we approve the Second District's decision in J.S.U.B. and disapprove the Fourth District's decision in Lassiter to the extent that it held that CGL policies can never provide coverage for a claim made against the contractor for damage to the completed project caused by a subcontractor's faulty workmanship.
It is so ordered.
ANSTEAD, QUINCE, and BELL, JJ., concur.
LEWIS, C.J., concurs in result only with an opinion.
WELLS, J., concurs in result only.
CANTERO, J., recused.
LEWIS, C.J., concurring in result only.
While I agree with the result reached by the majority, I cannot fully subscribe to the reasoning. Sufficient ambiguity exists in these post-1986 commercial general liability ("CGL") policies to afford coverage for insured contractors whose work is damaged by subcontractor negligence. See, e.g., State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998) ("[W]here policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer."). However, we must not overlook three major areas of concern with regard to emerging CGL jurisprudence. First, when one is attempting to determine and define the coverage afforded by any given insurance policy, the type of policy at issue must remain a central and critical concern. Second, courts, commentators, and parties to insurance contracts must remain wary of basing coverage determinations primarily upon the exclusions and exceptions within a contract, rather than upon the initial grant of coverage. Third and finally, the original function and scope of CGL policies *892 has been significantly altered, not by courts, commentators, or insureds, but by the insurance industry itself through drafting and marketing practices.
THE TYPE OF POLICY AT ISSUE.
It remains true that when an insurer fails to define a term in a policy, the insurer simply cannot validly assert that there should be a narrow and restrictive interpretation of the coverage provided under the contract. See, e.g., State Comprehensive Health Ass'n v. Carmichael, 706 So.2d 319, 320 (Fla. 4th DCA 1997). The coverage provided, however, must be gleaned in part from reference to the type of policy involved. Here, it should be remembered that "a commercial general liability insurance policy is generally designed to provide coverage for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or work is not that for which the damaged person bargained." 9A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 129:1 (3d ed.2005) (emphasis supplied).
I do not suggest that I agree with the decisions from other jurisdictions which hold that the defective work of subcontractors can never result in an "occurrence" under a CGL policy. See, e.g., Auto-Owners Ins. Co. v. Home Pride Companies, Inc., 268 Neb. 528, 684 N.W.2d 571, 575-80 (2004); L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33, 35-36 (2005). Rather, I caution that CGL coverage claims for those things other than the originally intended tort liability to third parties should be viewed with a cautious and suspect eye. See, e.g., 2 Jeffrey W. Stempel, Stempel on Insurance Contracts, § 14.01[B], at 14-17 (3d ed. 2007) ("The CGL, like most insurance policies, has a relatively targeted objective for insuring risks. It is designed to protect commercial operators from litigation and liability arising out of their business operations. . . . [T]he CGL is not designed to guarantee the quality of the policyholder's work or the successful completion of its business activities." (emphasis supplied)). Thus, in the interpretation of insurance policy language, as with the interpretation of any contract, one should remain cognizant of the type of policy or contract at issue and the type of coverage that is generally and naturally associated with such a policy. However, courts should only use interpretive tools to further the intent of the parties, not to usurp or contradict the language of the policy as written. See, e.g., Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc., 929 So.2d 729, 732 (Fla. 4th DCA 2006).
COVERAGE DETERMINATIONS SHOULD NOT BE MADE BASED UPON POLICY EXCLUSIONS.
The policy-interpretation linguistic gymnastics that tend to occur in some jurisdictions across the country in CGL cases, which involve the so-called subcontractor exception to the your-work exclusion, walk a very thin line of falling into violations of the rule that "exclusionary clauses cannot be relied upon to create coverage." See, e.g., CTC, 720 So.2d at 1074. However, the insurance industry itself created the language which has necessitated much of this at times thin and often thought-provoking interpretation by drafting CGL forms in a fashion that has pushed insureds and courts to rely on language in the exclusions to give meaning to all the words in the policy and to decipher the coverage grants. See, e.g., Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 73 (2004) (adopting a three-part approach to interpreting a CGL policy: (1) examine the initial coverage grant to determine if "property damage" or "bodily injury" has resulted from an "occurrence"; *893 (2) if "property damage" or "bodily injury" has occurred, examine the policy exclusions to see if the CGL policy's otherwise broad coverage is thereby narrowed to exclude the claim; and finally (3) determine if any exceptions to applicable exclusions restore otherwise excluded coverage); Elmer W. Sawyer, Comprehensive Liability Insurance 11 (1943) ("[I]nstead of insuring against only enumerated hazards, we now insure against all hazards not excluded." (emphasis supplied)). Furthermore, the "Business-Risk Doctrine" or the "Historical Model" conceptthe weapons upon which the insurance industry has generally relied to deny claims for faulty subcontractor worksimply do not appear anywhere in these post-1986 standard-form CGL policies, as demonstrated by the policy involved in J.S.U.B. See, e.g., ISO Policy Form Number CG 00 01 07 98, http://www.lexis.com; see also James Duffy O'Connor, What Every Construction Lawyer Should Know About CGL Coverage for Defective Construction, Constr. Law., Winter 2001, at 15, 15-16 (explaining that the Business-Risk Doctrine or Historical Model cannot be used to rewrite the actual language of the policy); 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor on Construction Law § 11:28 (2002 & Supp.2007) (substantially similar). These concepts should not be used to preclude coverage that the drafters of the policy intended and that insureds relied upon to justify paying additional premiums. Courts should not use the "concepts" of the Business-Risk Doctrine and Historic Model to simply bar coverage, in lieu of examining the policies as written. See Wanzek Constr., Inc. v. Employers Ins. of Wausau, 679 N.W.2d 322, 325-27 (Minn.2004) (avoiding this interpretive problem by modifying Minnesota's view of the Business-Risk Doctrine in light of the changed policy language present in post-1986 standard-form CGL policies).
It has become clear that if the insurance industry seeks to avoid further and expansive interpretations of its CGL policies, it must do a better job of more narrowly describing coverage and defining the type of "property damage," "bodily injury," and "occurrences" that it may intend these types of policies to cover, rather than adopting linguistic forms that tend to force courts to swim against the interpretive current by looking into the policy exclusions for answers to coverage questions to give meaning and life to all words utilized. Thus, while I am hesitant to place as much emphasis on the policies' exclusions and exceptions as does the majority, I certainly recognize that courts should not rely on ephemeral policy justifications when the actual language of the policy at issue and the parties' admitted intent do not include or reflect these justifications.
In these cases, this analysis leads me to the conclusion that we cannot simply rely on the Business-Risk Doctrine or Historical Model to deny the coverage claims of the insureds if neither the coverage grant nor the exclusions explain, reference, or use words to evidence these concepts in a manner that causes them to become controlling. The situation this Court faces, while facially complex, is actually fairly straightforward. The relevant CGL policy anticipates the "occurrence" of inadvertent (i.e., "neither expected nor intended") events, which result in "property damage" or "bodily injury."[12] The policies then fail *894 to outline the protections allegedly afforded as limited by the Business-Risk Doctrine or Historical Model, and the exclusions are ambiguous to the extent that we must find that they certainly do not exclude coverage for fortuitous damage that faulty subcontractor work causes to other portions of the completed project. If insurers wish to exclude this type of "occurrence" in this context, the onus is on themnot the courtsto clearly express that intent through the CGL policies they issue.
THE INSURANCE INDUSTRY HAS STRAYED FROM THE SCOPE OF COVERAGE ORIGINALLY PROVIDED BY CGL POLICIES.
Prior to the 1970s, there was minimal debate with regard to an expansive scope of coverage provided by CGL policies. Before that time, the wide-ranging consensus was that "[t]he coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss." Roger C. Henderson, Insurance Protection for Products Liability and Completed OperationsWhat Every Lawyer Should Know, 50 Neb. L.Rev. 415, 441 (1971). As I began my analysis of this case, that guiding principle directed my attention; however, it has become apparent that the insurance industry itself began to undermine that consensus, and maybe intentionally, in 1976 when it introduced the Broad Form Property Damage Endorsement ("BFPDE"), which altered the then-existing "your-work" exclusions. Specifically, the BFPDE extended coverage to general-contractor insureds for property damage caused by the work of their subcontractors, and decisions report that the industry has specifically acknowledged as much in its own publications. See, e.g., Md. Cas. Co. v. Reeder, 221 Cal.App.3d 961, 270 Cal.Rptr. 719, 725 (1990) ("[T]he ISO explains the broad form endorsement is intended to `exclud[e] only damages caused by the named insured to his own work. Thus, . . . [t]he insured would have coverage for damage to his work arising out of a subcontractor's work [and] [t]he insured would have coverage for damage to a subcontractor's work arising out of the subcontractor's work.'" (emphasis supplied)); see also James T. Hendrick & James P. Wiezel, The New Commercial General Liability FormsAn Introduction and Critique, 36 Fed'n Ins. & Corp. Couns. Q. 319, 360 (1986); National Underwriter Co., Fire, Casualty & Surety Bulletins, Public Liability Aa 16-17 (1993) ("FC & S Bulletin").
It appears that in 1986, the Insurance Services Office ("ISO") issued the fifth major revision of the standard CGL policy form. 9A Russ & Segalla, supra § 129:1. As part of that revision, the ISO lifted the extended coverage provided by the BFPDE and directly incorporated it into *895 the standard CGL policy in the form of the so-called subcontractor exception to the your-work exclusion. See 21 Eric Mills Holmes, Holmes' Appleman on Insurance § 132.9, 152-53 (2d ed.2002). As a direct result, the insurance industry continued to expand coverage for unintentional, contractual damages caused by subcontractors to the contractor-insured's completed project. See, e.g., FC & S Bulletin Aa 16-17 (explaining that the ISO intended this exception to the your-work exclusion to provide coverage for damages caused to the insured-contractor's completed work by the defective work of its subcontractors).[13]
Therefore, the scope of CGL policies has apparently been expanded to the extent that a CGL policy, which includes the subcontractor exception to the your-work exclusion, is in operation actually now the equivalent of a warranty or product coverage that affords protection for the contractors' product and work.[14]Cf. Stempel, supra § 14.13[B], at 14-216 ("Performance bonds and CGL policies serve different purposes. The performance bond ensures against claims for defective workmanship while the CGL insures for personal injury claims based on acts or omissions of the policyholder. Courts are wary of permitting claimants or policyholders to receive CGL policy proceeds for what functionally are claims of defective construction. . . ." (emphasis supplied)). It bears repeating, however, that traditional CGL policies were initially designed and intended to cover only tort liability for injuries sustained by third parties or their property, not contractual liability for products that fail to live up to the buyer's expectations.[15] *896 Moreover, ostensibly expanding the scope of coverage by altering the exclusions and exceptions present in a CGL policy, instead of amending the coverage grant, is counterintuitive from a policy or contract interpretation standpoint, but again, these changes were the result of the deliberate efforts of the insurance industry.
I find this tortuous, indirect melding of the characteristics of different types of insurance coverages, performance bonds, and warranty-type protection to be somewhat inconsistent and inappropriate. However, if the insurance industry now seeks to place blame or fault for the current conditions, it need only look in the mirror: the industry has been a force in producing this apparent confusion, not the insureds and not the courts. The ISO appears to have begun the clean-up process by providing an endorsement to the standard post-1986 CGL policy, which eliminates the subcontractor exception to the your-work exclusion. See, e.g., Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 10-11 (Tex.2007). The true resolution to a continuing saga of litigation "of words," however, is clarity of terms in all aspects of contract and policy preparation. The stacking of endorsements upon endorsements upon endorsements may or may not be the answer. Unfortunately, I suspect the latter.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
[2] Under the policies, J.S.U.B. had a per occurrence limit of $1 million, a general aggregate limit of $2 million, and a separate products-completed operations hazard aggregate limit of $2 million for which additional premiums were charged.
[3] The policies define "your work" as follows:

"Your work" means:
a. Work or operations performed by you or on your behalf; and
b. Materials, parts or equipment furnished in connection with such work or operations.
"Your work" includes:
a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
b. The providing of or failure to provide warnings or instructions.
[4] U.S. Fire does not argue that any of the policy exclusions apply to bar coverage.
[5] In 1986, the "Comprehensive General Liability" policy was renamed the "Commercial General Liability" policy. However, the acronym "CGL" is commonly used to refer to both. See id.
[6] The Insurance Services Office, Inc., also known as ISO, is an industry organization that promulgates various standard insurance policies that are utilized by insurers throughout the country, including the standard CGL policy at issue in this case. See, e.g., Hartford Fire Ins. Co. v. California, 509 U.S. 764, 772, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ("Insurance Services Office, Inc. (ISO), an association of approximately 1,400 domestic property and casualty insurers . . ., is the almost exclusive source of support services in this country for CGL insurance. ISO develops standard policy forms and files or lodges them with each State's insurance regulators; most CGL insurance written in the United States is written on these forms.") (citations omitted).
[7] For example, in Home Owners, the Third District relied on LaMarche and Weedo in concluding that a post-1986 CGL policy did not provide coverage for the cost of both repair and maintenance as a result of construction defects. See 683 So.2d at 529. However, the court also noted that the complaint did not identify any damages caused by the alleged defects. See id. at 528 n. 2. As explained below, it is unlikely that based on these allegations, there was coverage under the policy because there was no allegation that the faulty workmanship caused "property damage."
[8] American Girl most closely resembles the factual scenario in J.S.U.B. and the reasoning of the Second District. The Wisconsin Supreme Court held that damage to a warehouse caused by soil settlement, which was the result of a subcontractor's inadequate site preparation, was an "occurrence" because "[n]either the cause nor the harm was intended, anticipated, or expected." Am. Girl, 673 N.W.2d at 76.
[9] The Kansas Supreme Court explained that there are two different views reflected in the nationwide case law regarding whether defective construction can constitute an accident:

[O]ne line of cases has held that faulty or improper construction does not constitute an accident; rather, the damage is the natural and ordinary consequence of the insured's act. The other line of cases has held that improper or faulty construction does constitute an accident as long as the resulting damage is an event that occurs without the insured's expectation or foresight.
Lee Builders, 137 P.3d at 491. These two opposing views of the term "accident" are repeated by U.S. Fire and J.S.U.B. as well as the numerous amicus briefs filed in support of the parties. There are also law review articles that advocate both sides of the issue. Compare Clifford J. Shapiro, Point/Counterpoint: Inadvertent Construction Defects Are an "Occurrence" under CGL Policies, Construction Law. Spring 2002, at 13, with Linda B. Foster, Point/Counterpoint: No Coverage Under the CGL Policy for Standard Construction Defect Claims, Construction Law. Spring 2002, at 22.
[10] Although the petition for review in Lennar Corp. is still pending in the Texas Supreme Court and a final disposition has not been released, the Court's decision in Lamar Homes, Inc. appears to resolve the pending issue. However, we note that the Court did not specifically approve of the decision in Lamar Homes, Inc.
[11] U.S. Fire's reliance on the economic loss doctrine to support its position is unconvincing. "The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." Indemnity Ins. Co. of N.Am. v. Am. Aviation, Inc., 891 So.2d 532, 536 (Fla.2004). Thus, the economic loss doctrine determines what cause of action is available to recover economic lossestort or contractbut not whether an insurance policy covers a claim, which depends on the policy language. As explained above, we find no language in the CGL policies that limits coverage to tort claims.
[12] Opinions which assert that these CGL policies' definition of "occurrence" somehow excludes coverage for fortuitous damage caused by faulty subcontractor work fail to support that position with reference to the actual language of the policies. See, e.g., L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33, 34, 35-36 (2005) (without specifying which portions of a road project were completed by the subcontractorswho "perform[ed] most of the work"court held that damage to the completed project did "not constitute an occurrence under a CGL policy"). Focusing on the definition of "occurrence" does not explain how that definition excludes coverage ab initio for fortuitous damage caused by faulty subcontractor work. Clearly, general contractors intend for subcontractors to complete their work, but they do not generally intend or anticipate that subcontractors will complete their work in a faulty manner, which later results in damage to the completed project. Moreover, any damage caused by subcontractor work that the insured "intended" or "expected" is already excluded under the standard CGL policy, which undermines the position that finding coverage in these types of cases provides general contractors with an incentive to render shoddy construction work. See, e.g., ISO Policy Form Number CG 00 01 07 98, exclusion a. ("This insurance does not apply to `[b]odily injury' or `property damage' expected or intended from the standpoint of the insured." (emphasis supplied; internal division omitted)).
[13] I represent a prime exponent that CGL policies were originally intended solely to cover damages that the insured's operations caused to third parties' persons or property. However, there is substantial evidence, which I and the majority have noted, that the insurance industry itself altered this original intent by extending coveragealbeit in a convoluted fashionto insureds for fortuitous damage caused to their completed projects by faulty subcontractor work. Opinions that hold otherwise regarding standard-form post-1986 CGL policies do not address the evidence in this and other more recent CGL cases, which indicates that this extension of coverage, while inartfully executed, is exactly what the parties have accomplishedand intended to accomplishby altering the your-work exclusions to no longer exclude the type of coverage disputed in these cases. The law requires that we rely on the plain language of the policy's coverage provision, the ambiguity of the exclusions, and the ample evidence of the parties' intent to support the proposition that the policy does not clearly exclude otherwise-present coverage for fortuitous damage caused by faulty subcontractor work.
[14] With the increasing probability that current construction practices will result in construction projects entirely completed by subcontractors, many distinctions between work and product protection and CGL policies that include the subcontractor exception may have disappeared. The majority is correct that the owner-obligee is the direct beneficiary under a performance-bond type protection, but the same functional situation obtains when a disappointed owner sues a general contractor, who then requests coverage from its CGL insurer; the owner becomes the beneficiary of the CGL policy. This too is counter to CGL policies' original function, which was to provide tort-liability coverage for injuries caused to third parties' persons and property. However, this result appears to have been the intent of the parties due to the words of the contract and other supporting evidence.
[15] Insurers attempt to draft coverage language with a degree of precision. Liability insurance is intended to insure the policyholder against the consequences of third-party claims, while other types of insurance have traditionally insured against different types of risks. "To maintain this division of labor or compartmentalization, insurers draft liability policies with an eye toward preventing policyholders from obtaining first-party type protections from their liability insurance or converting their liability insurance into protection from nonfortuitous losses such as claims based on poor business operations." Stempel, supra § 14.13, at 14-211.